499 A.2d 1373

**Mary LAFORM and Mary Kolleogy, Administratrices of the Estate of Debbie Laform**

**v.**

**BETHLEHEM TOWNSHIP, and Brown-Borhek Company, and Pennsylvania Department of Transportation, and City of Bethlehem.**

**Appeal of CITY OF BETHLEHEM, Pennsylvania League of Cities.**

Superior Court of Pennsylvania.

Argued Oct. 16, 1984.

Filed Oct. 18, 1985.

514

516

Charles W. Craven, Philadelphia, for appellant.

William S. Hudders, Allentown, for appellees.

Before SPAETH, President Judge, CAVANAUGH, WIE-AND, McEWEN, CIRILLO, DEL SOLE, JOHNSON, PO-POVICH and CERCONE,* JJ.

CIRILLO, Judge:

The City of Bethlehem appeals from a judgment entered in the Court of Common Pleas of Northampton County after a jury awarded wrongful death and survival damages to the plaintiffs. The appeal was certified to the Court en banc to decide an important issue concerning the liability of a municipality for storm water runoff that flows out of the municipality into a lower-lying municipality and there contributes to a dangerous condition which injures a third person.

## I. Procedural Posture

This case began at the flooded intersection of William Penn Highway and Santee Road in Bethlehem Township, Pennsylvania. During a rainstorm, Debra LaForm stepped or slipped into a drainage ditch along Santee Road and was literally sucked through a drainpipe under William Penn Highway to her death. Debra's mother and sister commenced this suit against the Township, which owned and maintained Santee Road and the appurtenant ditch, and Brown-Borhek Company, owner of the adjacent property. The Township joined as additional defendants the Commonwealth of Pennsylvania Department of Transportation (PennDOT), proprietor of William Penn Highway and the

---

* Judge Cercone did not participate.

underlying drainpipe, and the City of Bethlehem, from which over three quarters of the surface water flooding the intersection originated. The Township, Brown-Borhek, and PennDOT settled with the plaintiffs out of court and entered into joint tort-feasor releases. The case proceeded to trial, whereupon the jury found $1,000,000 in damages and apportioned liability as follows: City, 51%; Township, 34%; PennDOT, 15%. The court had directed a verdict in favor of Brown-Borhek. The City's post-verdict motions were denied by the trial court sitting en banc. Judgment was entered on December 22, 1982, and later corrected to include delay damages and interest against the City.

On appeal the City contends that it is entitled to judgment notwithstanding the verdict. In considering the merits of this claim, we must regard the evidence in the light most favorable to the plaintiffs as verdict-winners, and give them the benefit of every fact and inference of fact reasonably deducible from the evidence. *Gonzalez v. United States Steel Corp.,* 484 Pa. 277, 398 A.2d 1378 (1979); *Miller v. Checker Yellow Cab Co. of Bethlehem,* 465 Pa. 82, 348 A.2d 128 (1975).

## II. Facts

The tragedy in this case began to unfold on the evening of February 24, 1977, when Debra LaForm's car stalled at the intersection of William Penn Highway and Santee Road. It had been raining heavily that evening and the intersection was completely flooded with storm water. Another motorist, Ross McLennan, soon found himself in the same predicament as his car stalled out in the deep water flowing over the roadway. Together Ross and Debra tried unsuccessfully to restart their cars. Debra then walked to a nearby hotel to phone for help. She returned to the scene across the parking lot of Brown-Borhek Company on the west side of Santee Road. Between the lot and the road lay a five-foot-wide by three-foot-deep drainage ditch owned by the Township of Bethlehem. At the time, the ditch was completely invisible to an onlooker because the water in the ditch was overflowing its sides, forming a flat, even surface

with water flooding the roadway itself. As McLennan watched from across William Penn Highway, a car passed between him and Debra, temporarily obstructing his view, and in the same instant Debra cried out and disappeared from sight.

Inside the ditch, water was rushing with ferocious velocity through an 18-inch drainpipe which took flowage from the ditch under William Penn Highway, where it discharged at right angles into a 48-inch pipe. This larger pipe in turn disgorged its contents into a stream called Nancy Run.

McLennan at first was dumbfounded by what he thought he had seen. After overcoming his initial disbelief, he began to search near the place where the girl had just been. Wading into the water, he felt around with his hands but managed to find only the drainpipe embedded in a concrete bulkhead and submerged in the coursing water. As realization shook him, he decided to contact the police.

Rescuers arrived at the scene and sealed off the intersection. A fireman was sent down into the ditch attached to a lifeline secured to the bumper of a firetruck. When he had advanced to within a few feet of the mouth of the drainpipe, the powerful suction yanked him off his feet and drew him into the pipe by his legs. The strength of several men had to be applied to haul him to safety.

Eight hours after Debra's calamitous plunge, searchers discovered her drowned body in Nancy Run.

The intersection of Santee Road and William Penn Highway had been a problem spot for years. It stood at a low point in the Nancy Run watershed. At least once or twice a year, usually during a winter rainstorm, it would be inundated with runoff from the surrounding locale. Precisely how long this flooding had been going on is not of record, but according to Leonard Fraivillig, Sr., former Township engineer and an expert witness for the plaintiffs, the condition probably predated 1959.

That year is significant because in that year PennDOT undertook general improvements on William Penn Highway, including installation of the drainpipes in question. Before installing the new system, PennDOT submitted the plans for the Township's approval. Fraivillig, however, refused to approve installation of the pipes because in his opinion a straight 96-inch pipe would be necessary to drain the ditch on the west side of Santee Road. PennDOT nevertheless went ahead with its plan and installed the smaller pipes.

At no point thereafter did PennDOT or the Township erect fences, guardrails, grates, or warning signs to protect passersby from the potential hazards of the ditch and drainpipes.

About a half mile north of the intersection, surface water flowed through a natural drainage swale into Bethlehem Township from the City of Bethlehem. Studies based on comparative acreage in the watershed had determined that 76.8% of the surface water that reached the intersection first fell within the City of Bethlehem, with the remainder coming from the Township. A sanitary sewer easement serving both municipalities was located in the course of the swale, but the swale itself was unimproved and basically followed the natural contours of the land downhill. Surface water ran overland through the swale until it came upon Santee Road about five blocks above the intersection. There the water took an abrupt turn and flowed down the roadway, wending its way around several streets in the Township before arriving at the intersection.

In the course of development, the City of Bethlehem had installed several storm sewers that emptied into the swale from streets in the northeast quadrant of the City. Major lines were opened onto the swale in 1958, 1967, and 1974. The City's storm sewers did not alter the natural course of water in the watershed nor direct water to the intersection from new sources. However, a study done in 1974 contained the following conclusions, which were stipulated into the record at the trial of this case:

Prior to any development in northeast Bethlehem storm water runoff followed a natural channel into Bethlehem Township. It is estimated that maximum flow due to a 10-year storm was 310 c.f.s. from fields and woodlands.

As the City was developed the runoff rate increased due to roofs, paving, graded lawns and some store drains; the present rate for that area may be 440 c.f.s. for an equivalent storm. When all streets, storm sewers and home construction is completed it is estimated that 10-year peak flows will be 500 c.f.s., and higher for 20 and 50 year storms.

Although the same channel continues to carry the water into the township the slight increase in total flow is concentrated in a shorter time resulting in much higher flow rates.

The "10-year storm" referred to in the report is that level of rainfall which, according to sound engineering practice, storm water disposal facilities should be designed to accommodate. Rainfall in the Bethlehem area on the date of the LaForm incident was significantly less than the level of a 10-year storm.

In 1974–75, the City bulldozed and flattened a portion of the drainage swale and built a large detention basin in the course of the swale about a half mile upstream from the city line. Typically a detention basis acts to retard the rate at which surface water flows off the land to points downstream. However, according to the plaintiffs' expert witnesses the City's basin failed to reduce flow rates downstream because it was too small and improperly designed. In practical operation, the basin prevented storm water from accumulating on properties within the City, but had a negligible effect on the flooding problem at William Penn and Santee. The plaintiffs' experts testified to other engineering options open to the City which would have alleviated downstream flooding.

One such option became the subject of a great deal of evidence in the case. Fraivillig, the Township's engineer, and engineers for the City had independently been studying

the situation and had come to the same general conclusions about the best way to solve the flooding problems plaguing the Township. In 1967, Fraivillig devised a comprehensive plan for storm water disposal in the Nancy Run watershed. The plan's main feature was a 96-inch underground drain-pipe extending from the outflow points of the City's storm sewers to a terminus in Nancy Run. Storm water entering the system from the City and Township would completely bypass the PennDOT pipes already in place under William Penn Highway. The proposed system would cost about $1,100,000 to install, a bill the Township could not foot on its own. Moreover, Fraivillig believed that the facilities existing in the Township were adequate to dispose of the Township's storm water; only the addition of the City's water rendered the facilities insufficient. Therefore, Fraiv-illig approached the City and suggested that the two munici-palities undertake the project as a joint venture.

The City's engineers agreed that Fraivillig's plan was sound from an engineering standpoint and that it would eliminate storm water flooding in the Township. However, Fraivillig's proposal for financing the system called for the City to bear the expense of all piping laid within the City as well as 80% of the piping laid in the Township. The City proposed, instead, that each municipality pay for the portion of the line within its own boundaries. The parties did not come to terms, and no further action was taken on the Fraivillig proposal.

### III. Theories of Liability

The trial court instructed the jury on four interrelated but distinguishable areas of law under which the City could be found liable: 1) a landowner's duties in the management of surface water; 2) general negligence law (the reasonable man standard); 3) Section 368 of the Restatement (Second) of Torts (1965); 4) Section 371, *id.*

### A

The law of surface waters in this jursidiction remains essentially unchanged from its origins in the maxim, "Wa-

ter must flow as it is wont to flow." Because water is descendible by nature, the owner of higher ground has an easement in lower land for the discharge of all waters that naturally rise in or flow or fall upon the higher. *Kauffman v. Griesemer*, 26 Pa. 407 (1856).

The rules of law which follow this fundamental law of nature originally were developed to adjust property and water rights between upper and lower landowners. However, the rules are equally valid as statements of a landowner's rights and obligations with regard to personal injury suffered on the lower land. *See, e.g., Piekarski v. Club Overlook Estates, Inc.*, 281 Pa.Super. 162, 421 A.2d 1198 (1980).

■ The law regards surface waters as a common enemy which every proprietor must fight to get rid of as best he may. *Strauss v. Allentown*, 215 Pa. 96, 63 A. 1073 (1906).

Under the so-called "common-law" or "common-enemy rule," not only is an owner of higher land under no liability for damages to an owner of lower land caused by water which naturally flows from the one level to the other, but he can, at least in the development of urban property, improve his land by regrading it or erecting buildings thereon, without legal responsibility for any consequent diversion of surface waters from his property to that of adjoining owners, it being recognized that changes or alterations in the surface may be essential to the enjoyment of his property.

*Chamberlin v. Ciaffoni*, 373 Pa. 430, 434–35, 96 A.2d 140, 142 (1953).

"The owner of upper land has the right to have surface waters flowing on or over his land discharged through a natural water course onto the land of another, ... He may make proper and profitable use of his land even though such use may result in some change in quality or quantity of the water flowing to the lower land: .... From those rules it is clear that only where the water is diverted from its natural channel or where it is unreason-

ably or unnecessarily changed in quantity or quality has the lower owner received a legal injury."

*Id.*, 373 Pa. at 436, 96 A.2d at 142–43 (quoting *Lucas v. Ford*, 363 Pa. 153, 155, 156, 69 A.2d 114, 116 (1949)).

> It is only where the owner of the higher land is guilty of negligence which causes unnecessary damage to the servient owner, or where, by an artificial channel, he collects and discharges surface waters in a body or precipitates them in greatly increased quantities upon his neighbor, that the latter may recover for any damage thereby inflicted: *Miller v. Laubach*, 47 Pa. 154; *Rhoads v. Davidheiser*, 133 Pa. 226, 19 A. 400; *Meixell v. Morgan*, 149 Pa. 415, 24 A. 216; *Pfeiffer v. Brown*, 165 Pa. 267, 30 A. 844; *Rielly v. Stephenson*, 222 Pa. 252, 70 A. 1097; *Morton v. Dormont Borough*, 334 Pa. 283, 5 A.2d 803; *Lucas v. Ford*, 363 Pa. 153, 69 A.2d 114; *Wilson v. McCluskey*, 46 Pa. Superior Ct. 594.

*Chamberlin*, 373 Pa. at 437, 96 A.2d at 143.

■ Thus, an upper landowner is liable for the effects of surface water running off his property only where he has A) diverted the water from its natural channel by artificial means, *see, e.g., Rau v. Wilden Acres, Inc.*, 376 Pa. 493, 103 A.2d 422 (1954); or B) unreasonably or unnecessarily increased the quantity (or changed the quality) of water discharged upon his neighbor, *see, e.g., Piekarski, supra.*

This is not a case of artificial diversion of surface waters. It is clear that the water flooding the intersection of William Penn and Santee roads ran there as a result of natural descent through the watershed. Nearly all the rainwater that fell in Bethlehem and flowed to the intersection would eventually have arrived there at some point even if the land upstream had been left in its natural condition.

Thus, we need consider only whether the City caused an unreasonable or unnecessary increase in the water flowing through its drainage swale. Here again, the evidence disclosed that the overall volume of water discharged through the swale changed very little over the years. The only increase of any significance was in the rate of flow.

 No doubt a landowner may be liable for unreasonably or unnecessarily increasing the rate or force alone at which he precipitates surface water upon lower land. *See Rau, supra.* However, we conclude that the evidence in this case was wholly insufficient to establish that the City of Bethlehem did anything to unreasonably or unnecessarily increase the rate at which surface water was discharged into Bethlehem Township. All the evidence showed was that over the years, due to the building of streets, houses, and storm sewers in the City, flow rates into the Township rose from 310 c.f.s. to 440 c.f.s. for a 10-year storm. There was no indication in the record when the course of development that accelerated the flow began. The William Penn-Santee intersection had probably been flooding since before 1959, and the City was undergoing steady development throughout the period relevant to this case. No dramatic change in the landscape caused a sudden pickup in flow through the channel; no single identifiable act or series of acts on the part of the City caused the intersection at William Penn and Santee to start flooding. Thus, we can only conclude that the buildup in flow rates from the time when the land was in its natural state to the time of the incident was solely a result of the normal and gradual development of the City.

Indeed, the conclusion is almost inescapable that there must have been flooding at that point in the watershed even before the first ground was broken in northeast Bethlehem. Prior to any development in the area, as stated, the flow rate for a ten-year storm was 310 cubic feet per second. For purposes of comparison, we note that an expert witness for the City testified that an 18-inch pipe such as that installed under William Penn Highway could carry away, when surcharged to its maximum limits, 25 cubic feet of water per second. Since flooding probably occurred at the intersection even before the pipe was there to impede the excess flow, it appears likely that storm water facilities at the intersection were never adequate to handle the amount of surface water generated in the City during a ten-year

storm. Consequently, there must have been some flooding there even in the natural state of the land.

However, we need not engage in speculation unfavorable to the plaintiffs' case, because we are certain that a city cannot be held liable for the effects of an incidental increase in surface waters flowing in a natural channel where the increase is owing to normal, gradual development in the city. This principle was firmly established long ago in the case of *Strauss v. Allentown, supra,* where the question was stated as follows:

> is the city liable to a property owner for the increased flow of surface water over or onto his property, arising merely from the changes in the character of the surface produced by the opening of streets, building of houses, etc., in the ordinary and regular course of expansion of the city[?]

The Court answered in the negative:

> the guiding principle for a decision is not at all doubtful, and is of frequent application. Every man has the right to the natural, proper and profitable use of his own land, and if in the course of such use without negligence, unavoidable loss, is brought upon his neighbor, it is damnum absque injuria. This is the universal rule of the common law, and nowhere is it more strictly enforced than in Pennsylvania.
>
> . . . . .
>
> The same rule must apply to the natural and proper development of a municipality. Cities are authorized to open, grade and improve streets and the abutting lot owners may build according to their requirements. In this natural change and development from agricultural or rural to urban territory some disturbance of the surface drainage is inevitable, but without negligence the municipality is not liable for the results: Carr v. Northern Liberties, 35 Pa. 324. Though a city may be authorized to construct sewers or an adequate system of drainage it is not bound to do so, nor is it liable for an erroneous

judgment as to what will be adequate: Fair v. Philadelphia, 88 Pa. 309.

215 Pa. at 98–99, 63 A. at 1073–74. These principles remain vital in the latter-day context of urban development. *See Leiper v. Heywood-Hall Construction Co.*, 381 Pa. 317, 113 A.2d 148 (1955); *Chamberlin v. Ciaffoni, supra; Kunkle v. Ford City Borough,* 305 Pa. 416, 158 A. 159 (1931).

We are cognizant that in the *Piekarski* case, *supra,* this Court upheld a finding of liability against a municipality based on an unreasonable or unnecessary flow of water onto lower-lying property. There are, however, important factual distinctions between that case and this one.

In *Piekarski,* a developer converted a hillside tract of completely rural land all at once into a housing development. Penn Township then inspected the streets and storm sewers installed in the subdivision and assumed ownership and control over them. The storm sewers emptied into a gully leading onto the property of an adjoining landowner at the bottom of the hill. After installation of the drainage system, water flooded the adjoining landowner's parking lot and flowed out onto an adjacent roadway during rainstorms. The landowner notified the Township of these conditions, but nothing was done to correct them. One evening during a heavy rain, an arc of water 3 or 4 feet wide and several inches deep was discharged onto the roadway from the Township's drainage system 900 feet away. A passing car entered the water and veered into an oncoming truck, killing both drivers.

Thus, Penn Township oversaw the rapid improvement of a rural tract of land without making adequate provisions for the increase in surface water caused by the development. As a consequence, water flooded directly onto a public roadway where no water had flowed before development, causing the dangerous condition in question.

The present case is fundamentally different. Here a section of the City of Bethlehem underwent gradual, orderly development which resulted in an incremental increase in

the rate of flow of surface waters draining through a natural swale. Different rules apply to the two situations.

By the latter half of this century, our courts started taking account of the special problems posed by the rapid urbanization of rural land. Urban- and suburban-type developments began expanding into the countryside, often replacing large portions of permeable ground with impenetrable hard surfaces. Often such precipitous development of rural land caused wrenching changes in the watershed, destroying in one fell stroke the land's natural ability to absorb surface waters, thus forcing them to flow in vastly increased rates and quantities onto neighboring land. Responding to these changing circumstances, the courts carved out a special exception to the general law of surface waters, and held that an "unnatural" use or development of rural land carries with it a responsibility on the developer to properly accommodate the increased flow of surface waters off the land, where such increase was predictable and preventable. *See Westbury Realty Corp. v. Lancaster Shopping Center, Inc.,* 396 Pa. 383, 152 A.2d 669 (1959) (17-acre tract of rural land completely macadamized and made into shopping center); *Miller v. C.P. Centers, Inc.,* 334 Pa.Super. 623, 483 A.2d 912 (1984) (apartment development in rural area an "artificial" use of the land).

Although *Piekarski* did not explicitly recognize the exception promulgated in *Westbury Realty,* the development in *Piekarski* clearly fell within the category of an "artificial" land use. The increase in surface waters caused by development on a rural hillside was predictable and preventable. Penn Township therefore had an affirmative duty to provide adequate drainage for the land, and its failure to do so was a crucial factor in the decision holding it liable for an unreasonable or unnecessary increase in surface waters.

However, the rule imposing a positive duty on a rural developer to provide adequate drainage has never been extended to urban property. Nor has it ever been used to find liability for an increase in surface waters incidental to a gradual changeover from rural to urban land. On the

contrary, the orderly development of land within a city has always been regarded as a natural use of land, for which a resulting increase in surface waters flowing through the natural ways is damnum absque injuria. *Chamberlin v. Ciaffoni, supra; Strauss v. Allentown, supra;* Sum.Pa. Jur. *Real Property* II, §§ 122, 124–26 (1959 & Supp.1978).

Hence, the City of Bethlehem should not have been found liable on this theory of recovery.

## B

Appellees assert, however, that the City of Bethlehem was "negligent" in failing to take proper measures to stem the water flowing from within its boundaries. The court submitted the issue of negligence to the jury on instructions that they were to consider whether the conduct of the City was reasonable given the facts and circumstances of the case.

It is likely that the jury was impressed with the facts that vast quantities of water cascaded down upon the Township from the City above, overloading the Township's facilities and flooding its streets; that the Township came to the City with a plan that everyone agreed would eliminate the flooding; and that Debra LaForm died as a result of conditions that the plan would have corrected. Faced with these facts, the jury may have concluded that the City's failure to go along with the plan or adopt other measures to control the flooding was unreasonable.

■ However, "It is axiomatic that a negligence claim cannot be maintained upon facts on which the law does not impose a duty. *Boyce v. United States Steel Corp.,* 446 Pa. 226, 285 A.2d 459 (1971); *Otto v. American Mutual Insurance Company,* 241 Pa.Super. 423, 361 A.2d 815 (1976)." *Williams by Williams v. Lewis,* 319 Pa.Super. 552, 556, 466 A.2d 682, 683 (1983). Here the City was under no duty to accept the Township's plan, nor to take other measures to abate the flooding problems in the Township; thus it was

error for the court to allow the jury to decide whether the City's conduct amounted to negligence.

The law pertinent to this issue was aptly summarized in *Yulis v. Ebensburg Borough,* 182 Pa.Super. 423, 426, 128 A.2d 118, 120 (1956):

By a long line of decisions our courts have held that municipalities are not bound to provide sewerage for the natural flow of the surface water, although they are invested with power to construct such sewers as in the judgment of the officers exercising the corporate powers are necessary and expedient. When they do adopt a plan of sewage they are not liable to answer in an action of trespass for damages resulting from the inadequacy of the sewers constructed according to the plan to meet the purpose contemplated, although they may be called upon to answer for injuries resulting from negligence in the actual work of construction or for failure to keep the work in repair after it is completed. *Cooper v. Scranton City,* 21 Pa.Superior Ct. 17, 19; *Fair v. City of Phila.,* 88 Pa. 309, 311, 312; *Haus v. Bethlehem Borough,* 134 Pa. 12, 18, 19 A. 437; *Siegfried v. So. Bethlehem Borough,* 27 Pa.Superior Ct. 456, 460; *Ringwalt v. Atglen Borough,* 49 Pa.Superior Ct. 517, 520. For a case very much in point, see *Loss v. Avalon Borough,* 276 Pa. 207, 209, 119 A. 915.

The water problems experienced by the Township were not due to the City's negligence in the construction or maintenance of its storm water facilities. It will be remembered that the flooding conditions at William Penn and Santee roads were unaffected by the City's construction of the detention basin or the other improvements made to the swale. The flooding resulted from the natural flow of surface water from the City, as augmented by changes in the watershed due to the City's natural development. The inadequacy of the detention basin to stop the flooding was therefore not grounds for liability.

The rule of municipal non-liability for inadequate storm sewerage was established long ago in the case of *Carr v.*

*Northern Liberties,* 35 Pa. 324 (1860). In *Carr* the Supreme Court expressed a reluctance to entrust to juries the power to sit in review over local government decisions whether and to what extent to provide public works which they had no statutory duty to provide. The Court reasoned that to allow such power to be exercised by courts and juries would constitute an encroachment on the legislative and administrative policy-making decisions of local government. As the Court explained, juries are not often apprised of all the factors that go into municipal decisions of this type, and are apt to find liability whenever an evil is suffered, regardless of the extent of the municipal improvements in place. The Court espoused similar rationales in *Fair v. City of Philadelphia,* 88 Pa. 309 (1879); *Strauss v. Allentown, supra;* and *Aron v. Philadelphia,* 310 Pa. 84, 164 A. 777 (1933).

Cuing on the references in these early cases to the discretionary authority of public officials, appellees argue that the common-law rule of non-liability for inadequate sewerage is founded on the doctrine of governmental immunity, a doctrine which the Supreme Court abolished in *Ayala v. Philadelphia Board of Public Education,* 453 Pa. 584, 305 A.2d 877 (1973). After *Ayala,* appellees assert, municipalities are liable for negligent omissions to act in discretionary matters, as well as for negligent acts. Since the City's failure to effectively control its surface waters continued after the *Ayala* decision, appellees conclude that given the circumstances known to it the City must be held liable for a negligent omission to act. *But see Vann v. Board of Education,* 76 Pa.Cmwlth. 604, 606 n. 2, 464 A.2d 684, 686 n. 2 (1983) (Political Subdivision Tort Claims Act of 1978 "restored" and "codified" pre-*Ayala* law of governmental immunity); *cf.* 42 Pa.C.S. § 8542(b)(5) (governmental immunity waived for dangerous condition of public service facilities, including sewers).

 We disagree with appellees' argument. *Ayala* abolished governmental immunity, but created no new rights and duties unknown to the common law. *See Wil-*

*liams v. Lewis, supra.* The lack of a duty upon a municipality to construct storm water containment or disposal facilities is a rule of the law of surface waters, not a rule of municipal immunity. Even a private landowner has no duty to provide storm sewerage on his land, so long as he does not in the course of development artificially divert surface water from its natural channel or unreasonably or unnecessarily increase its quantity in relation to his use of the land. *See Pfeiffer v. Brown,* 165 Pa. 267, 30 A. 844 (1895) (where landowner artificially concentrates and increases flow of water onto neighboring lands, he is liable if he could have prevented damage by reasonable care and expenditure). *Cf. Strauss v. Allentown, supra* ("The same rule must apply to the natural and proper development of a municipality").

Where a landowner, whether municipal or private, undertakes to install storm sewer facilities, then he takes upon himself the duty to avoid negligence in their construction or maintenance. *See, e.g., Yulis, supra; Hereda v. Lower Burrell Township,* 159 Pa.Super. 262, 48 A.2d 83 (1946); *Piekarski, supra; Medicus v. Upper Merion Township,* 82 Pa.Cmwlth. 303, 475 A.2d 918 (1984); *City of Washington v. Johns,* 81 Pa.Cmwlth. 601, 474 A.2d 1199 (1984); *see also Borough of Ambler v. Shepherd,* 443 Pa. 375, 278 A.2d 886 (1971) (when municipality adopts natural watercourse as part of its storm sewer system, it must keep the channel open and free of debris that obstructs the flow of water); *Cooper v. City of Reading,* 392 Pa. 452, 140 A.2d 792 (1958) (municipality under duty to maintain its property in safe condition). However, a landowner cannot be compelled to install such facilities, nor is he answerable in damages for the inadequacy of the facilities installed. *Strauss, supra; Carr, supra; Yulis, supra; Johns, supra.*

Thus, where the factors of artificial diversion or unreasonable or unnecessary increase are not present, a landowner is under no duty to tame the surface waters flowing over his land. Failure to control surface waters discharged through a natural channel as a result of the

ordinary and reasonable development of the land is not negligence. Accordingly, this was not a proper basis upon which to find the City negligent in this case.

## C

Section 368 of the Restatement (Second) of Torts (1965) provides:

**Conditions Dangerous to Travelers on Adjacent Highway**

A possessor of land who creates or permits to remain thereon an excavation or other artificial condition so near an existing highway that he realizes or should realize that it involves an unreasonable risk to others accidentally brought into contact with such condition while traveling with reasonable care upon the highway, is subject to liability for physical harm thereby caused to persons who

(a) are traveling on the highway, or

(b) foreseeably deviate from it in the ordinary course of travel.

Our initial reaction is to say that Section 368 does not apply to this case because the City of Bethlehem maintained no dangerous artificial condition on its property. The dangerous artificial condition in this case existed one-half mile away in the Township of Bethlehem, where the Township and PennDOT jointly maintained a ditch and drainpipe with the power to suck a human body down in times of heavy rain.

Appellees point out, however, that in the *Piekarski* case Penn Township's liability for allowing water to flood a nearby highway was based on Section 368 as well as on the law of surface waters. They stress that Penn Township's drainage system was located 900 feet from the highway, a distance not significantly lesser than the half-mile remove at which the City of Bethlehem's drainage swale crossed into Bethlehem Township. Thus, appellees would have us extend the *Piekarski* rationale to hold the City liable for the dangerous condition outside its premises.

However, we believe *Piekarski*'s holding on the Section 368 issue was prompted by the very same factors that led the Court to conclude that Penn Township's actions constituted improper water management under the law of surface waters. In other words, the Township's culpability did not reside solely in the fact that water drained off its property and created a dangerous condition on a highway. Rather, liability turned on the Township's negligence in assuming control over a drainage system that was inadequate to handle the excess surface water generated by the conversion of farmland into a housing tract, and on the resulting flooding of a roadway in a manner entirely unknown to the area in the period before development.

The present case again is distinguishable by the absence of proof of improper water management by the City or negligence in the provision of a drainage system. The evidence showed only an orderly course of development leading to a heightened flow of surface water through the way that Nature had set for it. Flooding during rainstorms was a persistent and most likely a natural problem in the watershed. The burden was on the Township to combat the increased surface waters coming from the City as best it could.

An extension of *Piekarski* to the facts of this case would, in our view, establish a very nearly absolute liability on an upper landowner for the deleterious effects of surface water flowing off his property. If the City could be liable for the flooding conditions at William Penn and Santee, why not conditions at another intersection even further downstream, or for that matter all other intersections between the city line and the stream? What if surface water discharged from the City during a particularly heavy rainstorm caused Nancy Run to overflow its banks miles downstream, flooding a roadway and injuring a motorist—are the City of Bethlehem and all other contributors to the Nancy Run watershed liable for the inadequacy of their sewage facilities to contain the rainwater?

▆▆▆▆ Mere statement of the issue convinces us that if a landowner is not liable in the first place for the manner in which surface waters leave his property, then he is not liable for any of the incidental effects or conditions they cause at a lower point in the watershed. Liability under Section 368 for creating a dangerous water runoff condition on a public highway must be preceded by some actionable negligence on the part of the landowner. Where water flows onto a highway naturally, or as a result of the type of normal development in a city which here confronts us, Section 368 is inapplicable against the upper landowner.

**D**

The final theory of liability is predicated on Section 371 of the Restatement (Second) of Torts, "Possessor's Activities":

> A possessor of land is subject to liability for physical harm to others outside of the land caused by an activity carried on by him thereon which he realizes or should realize will involve an unreasonable risk of physical harm to them under the same conditions as though the activity were carried on at a neutral place.

The example given in the Restatement of an "activity carried on" on land is the burning of brush causing smoke to drift onto a public roadway so as to obstruct the view of motorists. *See id.* Illustrations; *Brown v. Nebraska Public Power District,* 209 Neb. 61, 306 N.W.2d 167 (1981).

In Pennsylvania, the rule stated in Section 371 has been applied to a case of steam from a boiler carried across a roadway by wind. *Hudson v. Grace,* 348 Pa. 175, 34 A.2d 498 (1943); *see also Westerman v. Stout,* 232 Pa.Super. 195, 335 A.2d 741 (1975) (allocatur denied) (similar). *Accord, Timmons v. Reed,* 569 P.2d 112 (Wyo.1977). *See also Guy v. State,* 438 A.2d 1250 (Del.Super.Ct.1981) (growing of corn obstructing view at intersection).

▆▆▆▆ However, we do not think the evidence in this case can reasonably be said to show any "activity" on the part of the City of Bethlehem, unless the entire course of development in the City can be called an "activity." In any event,

the flow of the rainfall through the City's storm sewers was the operative cause of the injury, not the improvement of the town itself.

The only case decided in Pennsylvania under Section 371 with any similarity to the present case is *Simon v. Hudson Coal Co.*, 350 Pa. 82, 38 A.2d 259 (1944). There the defendant discharged mine water from its pumping station into a ditch or watercourse, causing the water level suddenly to rise three to six feet. The plaintiff's infant son was playing in the plaintiff's yard, through which the watercourse flowed, and fell into the ditch and drowned in the swollen stream. The Court upheld summary judgment for the defendant, holding that it had a legal right to discharge its water into the stream. The Court further held that neither the heightened flow of water in the channel nor the defendant's failure to warn of the discharge was a substantial factor in the boy's death, since he would have fallen into the channel regardless of these factors.

Of course, in the present case we cannot exclude the increased flow of surface water from the City of Bethlehem as a substantial causative factor in Debra LaForm's death. However, just as in *Simon*, the defendant was under no duty to restrain its water, and therefore its contribution to the tragedy was damnum absque injuria.

## IV

We therefore hold that the City is not liable to the plaintiffs on any of the theories advanced in the case. Lest our decision be misinterpreted as callousness in the face of the misfortune that befell the girl, we wish to comment briefly that without a doubt there were parties who bore responsibility for her death. This was not an act of God for which human fallibility may be exonerated. If moral condemnation were appropriate, a great proportion of the blame would have to fall on the Township of Bethlehem, which permitted a condition perilous to life and limb to exist on its property for many, many years. In this respect as well, the case is far different from *Piekarski*, where the

authorities with jurisdiction over the highway had no culpable part in causing the dangerous condition thereon.

Bethlehem Township was the only party in whom coexisted full control over the ditch, full knowledge of the level of floodwater that could be expected to flow through it during rainstorms, and full constructive or actual notice of the hazardous condition caused by PennDOT's installation of the woefully inadequate 18-inch drainpipe. Despite the Township's superior position to appreciate the risks involved, it never took the simplest of steps to secure the ditch from human catastrophe by installing guardrails, fencing, or protective or warning devices of any kind.

Since the City had no duty to control its surface waters in the context of this case, it was up to the Township to do whatever it could to make its roads safe for the traveling public. Debra's life was the price paid for its failure to settle for the relatively inexpensive measures available to it.

Judgment reversed; judgment n.o.v. to be entered for the City of Bethlehem.

SPAETH, President Judge, files a dissenting opinion, in which DEL SOLE, J., joins.

McEWEN, J., files a dissenting statement, in which DEL SOLE, J., also joins.

SPAETH, President Judge, dissenting:

I should affirm. The jury was properly instructed on the law of negligence. Applying that law to the evidence, it could properly find that the City of Bethlehem was responsible for the death of appellees' decedent, and we should not disturb its verdict. In entering judgment for the City notwithstanding the verdict, the majority holds that as an uphill landowner the City had an absolute privilege to develop and thereby increase the velocity of surface water run-off, without regard for the personal safety of appellees' decedent,[1] so long as "the increase [was] owing to normal,

1. For convenience, I shall hereafter refer to appellees' decedent simply as "appellee."

gradual development in the city." Maj. at 524. This conclusion is contrary to settled principle, and is without support in the law.

-1-

The majority's decision is a *non sequitur*. The majority states, correctly, that "the rules of law [regarding surface water run-off] originally were developed to adjust property and water rights between upper and lower landowners." Maj. at 522. One of these rules of law is that because "owners of lots in cities and towns buy and own with the manifest condition that the natural or existing surface is liable to be changed by the process of municipal development ..." *Reilly v. Stephenson*, 222 Pa. 252, 70 A. 1097 (1908), they may be said to have consented to, or assumed the risk of, damage to their property by increased surface water run-off. *See also Lare v. Young*, 153 Pa.Super. 28, 33 A.2d 662 (1943); *Bellas v. Pardoe*, 15 A. 662, 2 Mona. 357 (1888). It does not follow from these premises, however, that appellee may not recover from the City of Bethlehem. *She* was not the owner of a downhill lot; and in no sense may she be said to have consented to her injury. The majority's assertion that "the rules [that determine the rights and obligations of upper and lower landowners] are equally valid as statements of a landowner's rights and obligations with regard to personal injury suffered on the lower land," Maj. at 522, is, I submit, simply wrong.

-2-

In support of its assertion that the parties' respective rights and obligations are determined by the rules that determine the rights and obligations of upper and lower landowners, the majority cites our decision in *Piekarski v. Club Overbrook Estates, Inc.*, 281 Pa.Super. 162, 421 A.2d 1198 (1980). The citation is inapposite.

In *Piekarski* it appeared that a highway was flooded because of the defendant township's negligently designed and maintained drainage system on the top of a hill. A head-on collision occurred when the driver of an automobile, attempting to avoid the flooded area, veered to his left and

collided with a truck. Both the driver of the automobile and of the truck were killed, and their respective estates sued the township, among others, in negligence. The trial judge, applying upper riparian cases, charged the jury that the township could be found liable if the township's drainage system "unreasonably or unnecessarily" increased the flow of surface water onto the highway. In considering the township's argument that this was error, we opened our discussion by specifically noting that the township "[did] not dispute the [trial] court's application of upper riparian cases to this case." 281 Pa.Super. at 170 n. 1, 421 A.2d at 1202 n. 1. We went on to observe that "[t]hose cases have previously been applied only where an upper landowner injures a lower landowner, and not where, as here, an upper landowner injures a person traveling on the lower land." *Id.* We then said that "'[s]ince [the township had] not argued and briefed the significance, if any, of the difference between this case and the upper riparian cases' ... we [would] not discuss the issue." *Id.*, 281 Pa.Superior Ct. at 170–71 n. 1, 421 A.2d at 1202–1203, n. 1. With this definition of the issue, we proceeded to consider, and to reject, the argument, that the township *did* make, which was that as a *municipal* upper riparian landowner, it should be held to a lower standard of care than a *private* upper riparian landowner. *Piekarski*, therefore, not only does not stand for the proposition for which the majority cites it; it expressly states that it is not to be read as standing for that proposition.[2]

---

**2.** One further comment on the majority's generalizations about the law of surface water seems required. On pages 521 & 522 the majority states that the law of surface water "remains essentially unchanged from its origin in the maxim, '[w]ater must flow as it is wont to flow,'" and that "the owner of higher ground has an easement in lower land for the discharge of all waters that naturally rise in a flow upon the higher." This is what has been characterized as the civil law rule. *See generally*, Kinyon and McLure, Interference With Surface Waters, 24 Minn.L.Rev. 891, 893–897 (1940). Two paragraphs later in its opinion, *id.*, the majority states that "[t]he law regards surface waters as a common enemy which every proprietor must fight to get rid of as best he may." This is a statement of the so-called common law, or common enemy, rule. In effect, it is the opposite of the civil law rule, for instead of

-3-

This case is not a case between upper and lower land-owners. It is a claim that appellee, while at an intersection where she had a right to be, was drowned as a result of the city's negligence. The majority dismisses appellee's negligence claim by stating that "[i]t is axiomatic that a negligence claim cannot be maintained upon facts on which the law does not impose a duty." Maj. at 528, citing *Boyce v. United States Steel Corp.*, 446 Pa. 226, 285 A.2d 459 (1971). The majority then cites cases that hold that a municipality has no general obligation to build sewers. The issue here, however, is not whether the city had to build sewers but whether it owed a duty to appellee to exercise reasonable care to avoid injury to her.

The majority relies especially heavily on *Strauss v. Allen-town*, 215 Pa. 96, 63 A. 1073 (1906), but that decision in no way precludes a municipality's liability to respond in damages for personal injuries caused by its negligence. In *Strauss* the issue was stated as being whether "the city [was] liable *to a property owner* for the increased flow of surface water over or onto his property, arising *merely* from the changes in flow in the channels of the surface caused by the opening of streets, building of houses, etc., in the ordinary and regular course of expansion of the city." *Id.*, 215 Pa. at 98, 63 A. at 1073 (emphasis added). In holding that the city was not liable, the Court found "no sound reason why the same not apply to municipalities as to individuals". *Id.* It made plain, however, that this holding did not preclude liability for negligence. Thus, in explaining its decision, the Court said: "In this natural change and

being obliged to grant an easement for the discharge of surface waters, the lower landowner may fight off the discharge by any means available. *See* Kinyon and McLure, *supra* at 898–904. Although most jurisdictions adhere either to the civil law rule or the common law rule, or to a so-called rule of reasonable use, *see, e.g., Armstrong v. Francis Corp.*, 20 N.J. 320, 120 A.2d 4 (1956), one commentator has concluded that Pennsylvania follows the civil law rule in rural areas and the common law rule in urban areas. *See Weston,* Gone With The Water—Drainage Rights and Storm Water Management in Pennsylvania, 22 Vill.L.Rev. 901, 921 (1976–1977).

development from agricultural or rural to urban territory some disturbance of the surface drainage is inevitable, *but without negligence* the municipality is not liable for the results." *Id.*, 215 Pa. at 99, 63 A. at 1073, citing *Carr v. Northern Liberties,* 35 Pa. 324 (1860) (emphasis added). The "guiding principle" of its decision, the Court said, was that

[e]very man has the right to a natural, proper and profitable use of his own land, and if in the course of such use *without negligence, unavoidable loss,* is brought upon his neighbor, it is damnum absque injuria.

*Id.* 215 Pa. at 98, 63 A. at 1073 (emphasis added).

More recently, in *Leiper v. Heywood Hall Construction Co.,* 381 Pa. 317, 113 A.2d 148 (1955), which is also relied upon by the majority, our Supreme Court stated that a lower landowner may recover for damage inflicted where the "owner of the higher land is guilty of negligence". *Id.,* 381 Pa. at 320, 113 A.2d at 149 (quoting *Chamberlin v. Ciaffoni,* 373 Pa. 430, 437, 96 A.2d 140, 143 (1953)). And as already noted, in *Piekarski v. Club Overbrook Estates, supra,* we held that upper landowners, including municipal landowners, may be liable in negligence where they "unreasonably or unnecessarily" increase the flow of surface water.

In *Pfeiffer v. Brown,* 165 Pa. 267, 30 A. 844 (1895), which we quoted in *Piekarski,* it is stated that

the use which inflicts the damage must be natural, proper and free from negligence, and the damage unavoidable.... Hence, the practical inquiry is, first, whether the damage was necessary and unavoidable; secondly, if not, was it sufficiently obvious to have been foreseen, and also preventable by reasonable care and expenditure?

*Id.* 165 Pa. at 273, 30 A. at 845, quoting *Collins v. Chartiers Valley Gas Co.,* 131 Pa. 143, 18 A. 1012 (1890).

It is apparent, therefore, that when carefully read, the cases upon which the majority relies do not support the majority's position. The cases establish that an upper landowner municipality is liable in negligence for damages

caused by surface water runoff to the property of lower landowner. True it is, the lower landowner, because he *is* a lower landowner, will be held to have consented to, or assumed the risk of, *some* increases in surface water runoff. But this consent, or assumption of risk, does not extend to *negligent* increases. And if the upper landowner municipality may be liable in negligence for damage caused by surface runoff to the property of a lower landowner, surely the municipality may be liable in negligence for injury caused by surface runoff to the person of some one like appellee. For appellee consented to, or assumed the risk of, *nothing.* She was entitled to be where she was, and she was entitled to have *everyone, including* the city, exercise due care for her safety.

The fallacy in the majority's reasoning is that it equates appellee's position with the lower landowner's. It may be that in some circumstances an upper landowner may be entitled to say to a lower landowner, "You're going to have to put up with some of my surface runoff." But that has, literally, nothing to do with this case. It does not follow that because I can say or do something to *one* person, I can say or do it to *another.* My duty will depend upon who the other person is. Appellee was *not* a lower landowner, and the city's duty to her was *not* the same as its duty to a lower landowner.

-4-

When one recognizes that appellee is to be treated in her *own* right, and not as a lower landowner, the solution to this case becomes perfectly straightforward. For it is settled that a municipality may be liable for failing to exercise reasonable care with respect to persons, like appellee, foreseeably injured by surface water runoff.

In *Cooper v. City of Reading,* 392 Pa. 452, 140 A.2d 792 (1958), two children drowned in a sixteen foot deep pool that had been created by erosion caused by the frequent discharge of surface water from a Reading storm water outlet pipe. As in this case, the storm water originally fell within the city and was carried via a storm water control system,

for which the city had an easement, to an abandoned canal owned by the Commonwealth. Also as in this case, the city knew of the dangerous condition created by its storm water discharge because a report of a drowning three years ago, at the same location, had been filed with its police department. The Court held that the city had properly been found liable for the children's deaths. The Court noted that as an easement holder the city had the power "to secure and make safe its exercise of rights", *id.*, 392 Pa. at 462, 140 A.2d at 796 (quoting the trial judge), and that it was therefore subject to the liability of a possessor of land under Restatement of Torts § 339 (the attractive nuisance, doctrine). Reversing judgment n.o.v. for the city, the Court stated:

In the instant case the jury was justified in finding that the pool which the City allowed to form presented just such an unreasonable risk. Here, neither the appearance of the canal bed nor the land around it gave any indication that the pool concealed a "step-off" 16 feet deep in its center. Children could play in the water at its edges or upon the ice covering it without ever learning that it was anything more than what it appeared to be—an oversized puddle which had formed at the terminus of a pipe. The very fact that the pool was deceptively shallow at its edges and therefore innocent in appearance is the factor which created the unreasonable risk of harm to unsuspecting child trespassers. Whether the City exercised proper care in permitting the pool to exist in this condition, without giving any warning to the children it knew or should have known were using it as a place of recreation, was a question of fact and properly submitted to the jury for determination. *Cf. Altenbach v. Lehigh Valley Railroad Company*, 349 Pa. 272, 277, 37 A.2d 429 [(1944)], *supra; Barthold v. Philadelphia*, 154 Pa. 109, 110, 26 A. 304.

*Id.*, 392 Pa. at 463–64, 140 A.2d at 797.

The present case is at least as strong a case for liability as *Cooper*, for appellee was not a trespasser, as were the children in *Cooper*, but a lawful user of the highway, to

whom a high degree of care was owed. *Clifton v. Philadelphia*, 217 Pa. 102, 66 A. 159 (1907). The fact that the intersection where appellee was drowned was outside the city's municipal boundaries did not give the city the privilege of creating an unreasonably dangerous condition there. *Hudson v. Grace*, 348 Pa. 175, 180, 34 A.2d 498 (1943) (possessor of land in close proximity to public highway may not create unnecessarily dangerous conditions for traveling public); *Piekarski, supra*, 281 Pa.Super. at 180, 421 A.2d at 1207–08 (same); Restatement Second Torts § 368.

In *Decker v. City of Scranton*, 151 Pa. 241, 25 A. 36 (1892), the plaintiff sued for injuries incurred when the sleigh in which he was riding overturned on an accumulation of ice caused by the freezing of water from a broken water main and other sources. In affirming judgment for the plaintiff, the Court held:

> It was certainly [the city's] duty to construct and maintain suitable ditches and sluices to carry off the water which ordinarily flowed from springs and other sources outside and in the vicinity of the highway. It could not in violation of this duty allow such water to run along the centre of the road, until there was an accumulation of ice from it which rendered unsafe and obstructed travel thereon, without incurring liability to a party who in consequence thereof sustained an injury.

*Id.*, 151 Pa. at 243–44, 25 A. at 37.

Again, the present case is as strong as *Decker*. For whether the cause of the injury be ice or water on the highway, the principle is the same: a municipality has a duty not to create an unreasonably dangerous condition on the highway.

In *McCracken v. Curwensville Borough*, 309 Pa. 98, 163 A. 217 (1932), a case where the plaintiff's decedent was killed when the car he was driving slipped on an accumulation of ice and into a river, the Court stated:

> "If the city authorities were negligent in allowing a dangerous obstruction to exist in the public highway, which they could have removed, and the plaintiff was

injured thereby, without any fault of his own, the city was undoubtedly liable for the damages which he suffered. It is argued, however, that as the obstruction complained of was the result of natural causes, over which man has no control, therefore the defendant is not liable. This would be true if the effects produced by these causes were beyond human remedy; but ordinarily such is not the case. Roads are constantly being worn by the never ceasing action of the elements; but no one imagines that this is an excuse for a neglect to repair them. A sudden flood may render a public bridge or highway impassable, but surely that is no reason for allowing it to remain so forever. A municipality cannot prevent the general slipperiness of its streets, caused by the snow and ice during the winter, but it can prevent such accumulations thereof, in the shape of ridges and hills, as render their passage dangerous. It is no more difficult to remove or level such obstructions than it is those occasioned by the water and earth during the summer."

*Id.*, 309 Pa. at 104–05, 163 A. at 219, quoting *McLaughlin v. City of Corry*, 77 Pa. 109, 113, 18 Am.Rep. 432 (1874).

In *McDonough v. Munhall Borough*, 331 Pa. 468, 200 A. 638 (1938), the Court stated that it was

unable to find on the record any evidence of an unusual volume of water washing over the retaining wall which of itself would be sufficient to attract the attention of the borough authorities, or put them on constructive notice of a dangerous condition.

*Id.*, 331 Pa. at 473–74, 200 A. at 640.

Finding no notice, and therefore no negligence, the Court reversed the plaintiff's judgment and entered judgment for the borough. Here, there is no dispute that the city knew of the dangerous condition that its surface water runoff created.

*Strauch v. City of Scranton*, 157 Pa.Super. 174, 42 A.2d 96 (1945), is to the same effect as *McDonough*. There we

found, as the Supreme Court had found in *McDonough*, that the record contained no evidence of the city's negligence. *Id.*, 157 Pa.Superior Ct. at 179, 42 A.2d at 99. We therefore entered judgment for the city. In the course of our discussion we cited *McCracken v. Curwensville Borough, supra,* and *Decker v. City of Scranton, supra,* as illustrative of cases in which a municipality had been properly held liable for negligence. We explicitly recognized that depending on the particular situation and danger, a municipality may be under a duty to construct a drainage system: "The line of demarcation between discretionary and mandatory construction of drainage systems by a municipality is determined by the volume of flow and discharge of surface water in each instance." *Id.*, 157 Pa.Superior Ct. at 178, 42 A.2d at 98.

The decisions of courts of other jurisdictions are to the same effect. Thus, in *Booth v. District of Columbia*, 100 U.S.App.D.C. 32, 241 F.2d 437 (D.C.Cir.1956), the evidence was held to have established the municipality's negligence. In that case the plaintiff's car was caught in a swift and deep current of flood water and was trapped against a pole. Attempting to escape from her car, the plaintiff lost consciousness and floated downstream until she was rescued by a police officer. She sued for her personal injuries and the damage to her car, alleging that the municipality was negligent because flooding at the location where her car was caught was frequent, and the municipality knew it and should have prevented it. *Id.* at 32–33, 241 F.2d at 437–38. As we should do in this case, the Court of Appeals recognized the issue as one "of municipal liability, not for injury to property by a sewer, but for a personal injury to a traveler by a want of repair in the highway". *Id.* at 33, 241 F.2d at 438. Similarly, in *Eschete v. City of New Orleans*, 258 La. 133, 245 So.2d 383 (1971), where the plaintiffs sued for personal injuries and property damage, alleging that the city was negligent in authorizing new development within its borders knowing that the development would cause

flooding downhill, the Supreme Court of Louisiana reversed an order that no cause of action had been pleaded:

> The plaintiffs are seeking to hold the city, not for failing to provide adequate drainage, but for fault in adding new subdivisions, thus increasing the volume of water in the drainage area. In effect, according to the petition, the power to grant or withhold consent for new subdivisions in the Pines Village drainage area effectively controlled the volume of water discharged in that area.
>
> For its fault the city may be held liable....

*Id.* at 138, 245 So.2d at 385 (citations omitted).

*See also, City of Rome v. Brown,* 184 Ga. 34, 190 S.E. 787 (1937) (where city negligently constructed street, causing water to pool on plaintiff's property, city may be liable for personal injury and property damage); *North Judson v. Lightcap,* 41 Ind.App. 565, 84 N.E. 519 (1908) (where streets negligently built city may be liable for damages caused by surface water runoff). *See generally,* 18 McQuillen, Municipal Corporations, § 53.142 ("A municipality which is negligent in the construction or improvement of its streets, thereby causing injury from surface waters, is undoubtedly liable").

-5-

To establish the city's negligence, appellee had to show that the city had a duty to conform to a certain standard of conduct; that it did not conform to that standard; and that its failure to conform to that standard caused actual loss to her. *Morena v. South Hills Health System,* 501 Pa. 634, 462 A.2d 680 (1983); *Macina v. McAdams,* 280 Pa.Super. 115, 421 A.2d 432 (1980). If the city should have foreseen the likelihood of harm resulting from its act or omission, it may be found negligent. *Dahlstrom v. Shrum,* 368 Pa. 423, 84 A.2d 289 (1951). If the city by its act or omission created an unnecessary risk to innocent persons, it may be found negligent if the risk outweighed the advantages of its

act or omission. *Clewell v. Pummer*, 121 A.2d 459, 384 Pa. 515 (1956). The trial court fully instructed the jury on the city's obligation to conduct itself as would a reasonably prudent person in the circumstances disclosed by the evidence. As appellant, the city has no objection to the instructions—except for its unwarranted contention, which the majority has accepted, that it cannot be liable because the increased flow of water resulted from the regular expansion of the city, with a consequent increase in the number of streets and homes. Brief for Appellant at 15.

I think it clear that the jury could properly find the city liable to appellee in negligence. The city was warned as early as 1966 that the intersection where appellee was drowned was subject to flooding, and that almost 77% of the flood waters originated within its boundaries. N.T. 149–50, 164. All parties stipulated to a report by Edgar K. Mulhausen, an engineer in the city's department of public works, that the velocity of the surface water run-off had, because of the city's development, increased by 40% from its natural state of 310 cubic feet per second to 440 cubic feet per second. N.T. 484, 656. And yet, knowing of the increased danger caused by its development, the city did nothing to alleviate the danger. Instead, to protect its citizens' yards and cellars from flooding, it built a detention basin in the natural drainage swale leading to the intersection where appellee was drowned. N.T. 227, 230. That basin did not, and was not intended to, alleviate flooding at the intersection. N.T. 227. When Bethlehem Township devised a plan that would have alleviated the flooding, the city chose not to cooperate, for the reason that its proposed share of the cost would be too great. That was hardly a reason the jury was obliged to accept. Instead, the jury could properly find that the city had a duty of reasonable care for the safety of travelers at the intersection; that in the exercise of that duty the city should have foreseen that when the intersection was flooded, a traveler might drown; that in failing to do anything to alleviate that danger, the

city failed to fulfill its duty; and that its failure caused appellee's death.

I do not doubt that Bethlehem Township and the Pennsylvania Department of Transportation, which between them had more immediate control over the intersection, were also properly found negligent by the jury. Their failure to exercise their respective duties of reasonable care for appellee's safety, however, in no way relieved the city of its duty of reasonable care. *See Carlson v. A & P Corrugated Box Corp.*, 364 Pa. 216, 72 A.2d 290 (1950) (where tortfeasors are guilty of concurrent negligence each is responsible for full amount of damages on theory that but for its negligence none of the damages would have been sustained) *Coyne v. Pittsburgh Railways Co.*, 393 Pa. 326, 141 A.2d 830 (1958) (if negligence concurs with some other event so that but for that negligence injury would not have occurred both defendants responsible).

I should affirm the judgment of the trial court.[3]

DEL SOLE, J., joins.

McEWEN, Judge, dissenting:

While my distinguished colleagues of the majority have expressed with clarity a very thoughtful rationale of position, there is no question in my mind but that the jury should have been permitted to find that the City of Bethlehem had a duty to the decedent. As a result, I am, very respectfully, compelled to dissent and to reecho the view expressed by our learned President Judge Edmund B. Spaeth, Jr. that:

> ... the jury could properly find that the city had a duty of reasonable care for the safety of travelers at the intersection; that in the exercise of that duty the city should have foreseen that when the intersection was flooded, a traveler might drown; that in failing to do

---

**3.** I do not discuss appellant's remaining arguments for I find that the trial court's opinion has adequately disposed of them.

anything to alleviate that danger, the city failed to fulfill its duty; and that its failure caused appellee's death.

DEL SOLE, J., joins.