## Magee v. Marshman

*Wayne C. Buckwalter,* for plaintiffs.
*Stephen J. Mascherino,* for defendants.

WOOD, *J.*, October 19, 1993—Plaintiffs complain that the sole remaining defendants in this case, the Millers, caused unnecessary and unreasonable additional water flow onto their land and artificially diverted the natural course of surface waters by improving their property in violation of common law doctrines and the Storm Water Management Act, Act of October 4, 1978, P.L. 864, 32 P.S. §§680.1-680.17, *repealed in part by* Act of 1980, 71 P.S. §732-504. After hearing evidence on September 7, 1993, I make the following:

## FINDINGS OF FACT

(1) Plaintiffs, John A. Magee, Jr. and Lynne B. Magee, are the owners of approximately five acres of real prop-

erty known as 227 Old Wilmington Rd., Chester County, Pennsylvania. This property is used for a residence and horse pasture.

(2) Defendants, Terry R. Miller and Theresa A. Miller, are the owners of real property known as lot no. 5 in West Sadsbury Township. This property abuts the Magee property upgrade and to the south.

(3) The Miller property, lot no. 5, was part of a subdivision plan approved by West Sadsbury Township which required storm water management plans to be submitted with the building permit application for individual lots.

(4) No storm water management plans were ever submitted or prepared by the Millers.

(5) On July 23, 1986, defendants obtained a permit to build a driveway on lot no. 5. The defendant removed a few inches of top soil to construct the driveway. The work was completed on August 18, 1986. The driveway followed the natural curve of the land and measured approximately 500 feet long and 10 feet wide. The lowest part of the driveway contained a ballast underneath which measured three feet wide and four feet deep. The defendant did not take any precautions to accommodate increased surface water flow.

(6) Defendants constructed their home January of 1987, after putting in the driveway.

(7) In the spring of 1987, plaintiffs conducted three two-hour inspections in anticipation of purchasing the property at 227 Old Wilmington Rd. Plaintiffs' inspection revealed a pasture of unmowed grass about five inches tall and a 10-foot strip of wet area in the southeast corner of the parcel.

(8) In May of 1987, plaintiffs purchased the property at 227 Old Wilmington Rd.

(9) In June of 1987, plaintiffs moved into the residence at 227 Old Wilmington Rd. At or about the same time, defendant contracted to have their driveway stoned because of water drainage problems created by the driveway.

(10) After the work on defendants' driveway had begun, plaintiffs noticed that water had accumulated where none had been before.

(11) By the early fall of 1987, pools of water and mud occupied one-half an acre of the Magee property which was previously pasture. At or about this time, the fence surrounding the property fell down.

(12) Plaintiff consulted Yerkes Associates Inc., a group of consulting engineers with expert knowledge of storm water management. Representatives from Yerkes Associates, Inc. inspected the Magee and Miller properties.

(13) Before construction of the driveway, the storm water drained in a sheet flow pattern. Construction of the driveway changed the characteristic ground cover and the means of water discharge on the Miller property. Specifically, the driveway diverted the point at which water came onto the Magee property. This diversion redefined the natural channels of water flow and caused peak water discharge to increase on the Magee property. The altered water drainage patterns resulted in a greater volume of water concentrated in the southeast corner of the Magee property.

(14) The altered flow created a "new wet soil area" as opposed to the "natural wet soil area."

(15) Defendants could have designed the driveway to prevent an increase of peak water discharge on neighboring properties. A storm water management plan could have provided a feasible way to prevent excess runoff.

Both plaintiffs' and defendants' storm water management expert agreed that, had they been consulted, they would have advised the defendant to implement some kind of storm water management system.

(16) Testimony concerning weather patterns in the 1980s was not supported by sufficient evidence linking it to the condition of the Magee property to become probative on any issue.

(17) Plaintiffs did not prove by a preponderance of the evidence that damage to the fence was caused by increased water on the property.

(18) Neither quartering horses nor mowing pasture on the Magee property caused or exacerbated the swamp problem at the southeast corner of the parcel.

## DISCUSSION

### 1. *Statutory Remedy*

The Storm Water Management Act of 1978, 32 P.S. §680.1-15, *repealed in part by* Act of 1980, 71 P.S. §732-504, was enacted to encourage the planning and management of storm water runoff, 32 P.S. §680.3. The general assembly found that "a comprehensive program of storm water management, including reasonable regulation of development and activities causing accelerated runoff, is fundamental to the public health, safety, and welfare and the protection of the people of the Commonwealth, their resources, and the environment," 32 P.S. §680.2. The Act directed each county, in consultation with concerned municipalities, to prepare and adopt a storm water management plan, 32 P.S. §680.5-6, after the Department of Environmental Resources promulgated guidelines in accordance with 32 P.S. §680.14. The Act provided for an action in mandamus to compel municipalities to submit or adopt plans

under 32 P.S. §680.10, and established sanctions for failure to adopt the implementing ordinances under 32 P.S. §680.12. Further, the Act required "landowners or any person engaged in the alteration or development of land which may affect storm water runoff characteristics to implement measures necessary to prevent injury to health, safety, or property," 32 P.S. §680.13. Specifically, the Act enumerated two standards: "(1) To assure that the maximum rate of storm water runoff is no greater after development than prior to development activities; or (2) to manage the quantity, velocity, and direction of resulting storm water runoff in a manner which otherwise adequately protects health and property from possible injury." The general assembly declared that violations of the Act constituted a public nuisance and provided a civil right of action for equitable and legal relief to "any aggrieved person," 32 P.S. §680.15. Section 15, embodying the private right of action, was repealed in 1980.

Defendant did not submit a storm water management plan, and plaintiffs suggest that he should have. In *Bahor v. City of Pittsburgh,* 158 Pa. Commw. 150, 631 A.2d 731 (1993), the lead opinion concluded that a single-lot owner should prepare such a plan, but the two concurring panel members disagreed, reasoning that that requirement only applies to developers of multiple lots. Thus, there is a question whether such a plan is required. In addition, the *Bahor* court said that to recover under sections 13 and 15, the plaintiff must introduce evidence of the applicable county storm water management plan and prove that the defendant violated this plan. In this case, the plaintiffs did not prove the county's storm water management plan. The evidence merely showed that West Caln Township did not require and never received a storm water management plan for the de-

fendants' house or driveway. Without evidence of *the applicable* county storm water management plan, I cannot decide if the defendants violated the provisions of section 13. Even with evidence of an applicable plan and its violation, the plaintiffs' cause of action under the Storm Water Management Act is uncertain because the private right of action under section 15 has been repealed.

## 2. *Common Law Remedy*

The law of the Commonwealth regards surface waters as a common enemy which every landowner must struggle to dispose of as best as possible. *Strauss v. Allentown,* 215 Pa. 96, 63 A. 1073 (1906). Under this rule, an upgrade landowner is not liable for damage to a lower landowner's property caused by water which naturally flows from one level to the other. Further, an upgrade landowner is normally entitled to improve his property without liability for diversion of surface waters. *Chamberlin v. Ciaffoni,* 373 Pa. 430, 96 A.2d 140 (1953). However, in response to the rapid expansion of urban- and suburban-type developments in rural areas, the courts carved out an exception to the general law of surface waters, and held that an "unnatural" use of rural land carries with it a special "responsibility on the developer to properly accommodate the increased flow of surface waters off the land, where such increase was predictable and preventable." *Laform v. Bethlehem Tp.,* 346 Pa. Super. 512, 527, 499 A.2d 1373, 1380 (1985). In other words, an upgrade landowner is liable for damage to a lower landowner's property where he has unreasonably or unnecessarily increased the quantity or altered the quality of surface waters or where he has diverted the water from its natural path by artificial means.

The pools of water on plaintiffs' property cannot be characterized as incidental to development. Incidental changes in water flow occur gradually, as land is developed, rather than suddenly, as a result of a single identifiable act. *Id.* at 525, 499 A.2d at 1379. It was reasonable for defendant to develop their land. However, their manner of development was unreasonable. Here, defendant constructed a driveway without regard to the path of surface waters. This is just the type of dramatic change in landscape which causes a sudden pickup in water flow. Defendant's failure to take necessary precautions to accommodate surface waters when developing rural land artificially diverted the path of water on their land and caused an unreasonable increase in the quantity and quality of water flowing onto their neighbor's land. This increase was both predictable and preventable. See: *Westbury Realty Corp. v. Lancaster Shopping Center, Inc.,* 396 Pa. 383, 152 A.2d 669 (1959) (defendant liable for damages where 17 acre tract of rural land was developed into a shopping center); *Miller v. C.P. Centers, Inc.,* 334 Pa. Super. 623, 483 A.2d 912 (1984) (apartment development in rural area an "artificial" use of land); *Ridgeway Court, Inc. v. Landon Courts, Inc.,* 295 Pa. Super. 493, 442 A.2d 246 (1981) (defendant liable where its development of land included removal of a hill, resulting in part of the surface water flow being diverted from its natural course and redirected across plaintiff's property).

### 3. *Damages*

Plaintiffs are entitled to be compensated for the cost of restoring that part of their pasture damaged by flooding. Plaintiffs are also entitled to relief which will prevent flooding on their property in the future. Different types of storm water management systems are available

to manage the excess water flow. I leave it to the parties to decide which type of plan will best suit their needs.

Plaintiffs request an award for damage to their fence. However, the evidence demonstrated that damage to the fence was due to poor construction and to the plaintiffs' horses leaning over the side, rather than the wet condition of the land.

Plaintiffs also request an award of $4,831.55 for the cost of Yerkes Associates, Inc. They submitted invoices into evidence which break down the fee. These invoices reveal that the sum reflects more than simply the cost of studying the storm water problem. Part of the fee represents numerous conversations with the plaintiffs' attorney and others whose interest in this matter is undisclosed. Further, the purpose of some of the services rendered is not evident from the invoices. These unsubstantiated amounts have been subtracted from the award.

## CONCLUSIONS OF LAW

(1) The court has jurisdiction in this matter.

(2) Defendants have unnecessarily and unreasonably increased the quality and quantity of surface waters flowing onto the plaintiffs' land by developing their driveway without an adequate storm water management plan.

(3) Defendants have artificially diverted the natural flow of surface water and caused it to be discharged onto the plaintiffs' land.

(4) Plaintiffs' damage includes the cost of creating a swale or some other storm water management system and the cost of restoring the one-half an acre where pools of standing water exist to pasture. The award for restoring the land is one-quarter of plaintiffs' es-

timate, because the damage affected only one-quarter of the pasture.

(5) Defendants are not responsible for damage to the fence.

## ORDER

And now, October 19, 1993, it is hereby ordered that:

(1) Plaintiffs and defendants have 30 days to work out a joint plan that will manage the excess water created by the Miller driveway, provided, however, that such plan shall comply with any requirements of the Department of Environmental Resources or any other interested local, state, or federal agency. Defendants shall pay the first $2,000.00 of such joint plan. If plaintiffs and defendants cannot agree on a plan to alleviate the flooding, defendants shall pay plaintiffs the sum of $2,000.00 and permit plaintiffs and their agents to enter onto the property for the purpose of installing a storm water management system.

(2) Defendants shall pay $325.00 to plaintiffs for plowing, disking, and reseeding one-half an acre of pasture.

(3) Defendants shall pay $3,105.75 to plaintiffs toward the costs of Yerkes' consulting fees.

(4) Plaintiffs' request for counsel fees is denied, without prejudice.[1]

---

1. "When counsel fees are sought under the provision of 42 Pa. C.S. §2501 as a part of the taxable costs of a matter, the party seeking them shall do so by filing an appropriate petition within the 20 days of the conclusion of the case in this court." C.C.R.C.P. 241.