**In re ESTATE OF Jon Erik SCHAR-LACH, an incapacitated person.**

**Appeal of: Estate of Jon Erik Scharlach, Appellant.**

**In re Estate of Jon Erik Scharlach, an incapacitated person.**

**Appeal of: PNC Bank, National Association, Appellant.**

**In re Estate of Jon Erik Scharlach, an incapacitated person.**

**Appeal of: Estate of Jon Erik Scharlach, Appellant.**

Superior Court of Pennsylvania.

Argued March 12, 2002.
Filed Aug. 29, 2002.

Lawrence S. Rosenwald, Philadelphia, for Estate of Scharlach.

Michael J. Donohue, Scranton, for PNC Bank.

Before: JOYCE, BOWES and BROSKY, JJ.

OPINION BY BOWES, J.

¶ 1 This is an appeal and cross–appeal from a July 26, 2001 order granting summary judgment and denying certain fees. Helen Scharlach, in her capacity as guardian of the person of her incapacitated son,

Jon Erik Scharlach, appeals the orphans' court's refusal to impose a surcharge against PNC Bank, N.A. For ease, we refer to Mrs. Scharlach as Appellant.

¶ 2 In its cross-appeal, PNC Bank, N.A., the guardian of the estate of Jon Scharlach, challenges the court's refusal to grant it termination fees for guardianship services and attorney's fees for defending the surcharge action. PNC Bank will be referred to as Appellee.

¶ 3 We conclude that the orphans' court improperly determined that Appellant was guilty of acquiescence and laches. We also find that Appellee breached its fiduciary duty with respect to its investment of the principal of the incompetent's estate. Thus, we reverse the orphans' court's denial of summary judgment to Appellant, and affirm its refusal to grant termination and attorney's fees to Appellee. We reverse and remand for proceedings consistent with this adjudication.

¶ 4 The following facts are relevant. Mr. Scharlach was born on January 5, 1966, in Staten Island, New York. Shortly after his birth, his brain was poisoned with bilirubin, and as a result, he was severely incapacitated and will never function beyond the level of a two-year-old child. His condition was the result of medical malpractice committed immediately following his birth. Appellant and her now-deceased husband instituted a medical malpractice action in New York after Mr. Scharlach reached majority that resulted in a judgment in the amount of $800,000 on his behalf.

¶ 5 On June 5, 1989, Appellant petitioned for the appointment of a guardian of the estate of her son. Appellant was represented by attorney E. David Christine, Jr. Due to an oversight, Mr. Scharlach was not adjudicated incompetent at that time, but on December 18, 1989, First Eastern Bank, N.A. ("First Eastern") nonetheless was appointed to act as guardian of the estate.[1] First Eastern received $800,000, which represented the proceeds of the above-referenced personal injury action that had been instituted on behalf of Mr. Scharlach.

¶ 6 Immediately after the orphans' court herein appointed First Eastern as guardian of the estate, it entered the following order:

> First Eastern Bank is directed to invest as guardian the corpus of the incompetent's estate no more than One Hundred Thousand ($100,000) in any single investment, other than investments in direct obligations of the United States Government. First Eastern Bank is hereby granted leave to petition this Court for an amendment to this Order should conditions merit an appropriate adjustment of the investment scheme for the assets.

Order of Court, 2/8/90, at 1. Since the inception of the guardianship in 1990, the principal consistently was invested in federally-insured investments or obligations of the United States Government.

¶ 7 Ten years later, on July 14, 2000, Appellee petitioned to be relieved of the investment restrictions contained in the February 8, 1990 order, and three days later, was granted permission to invest in equities and other investments authorized under the prudent investor rule set forth in 20 Pa.C.S. § 7203.[2]

1. In June 1994, PNC Bank became successor guardian when it acquired First Eastern.

2. 20 Pa.C.S. § 7203 (effective December 25, 1999) provides:

> **(a) General rule.**—A fiduciary shall invest and manage property held in a trust as a prudent investor would, by considering the purposes, terms and other circumstances of

¶ 8 On August 16, 2000, Appellant petitioned to be appointed the guardian of Mr. Scharlach's person. To cure the prior omission, a competency hearing was held at that time. During the hearing, Appellant expressed dissatisfaction with Appellee's administration of Mr. Scharlach's assets and asked that East Stroudsburg Savings Association be designated successor guardian of the estate. Appellant's petition was granted on October 17, 2000; Appellant was appointed guardian of the person, and East Stroudsburg Savings Association was appointed successor guardian of the estate.

¶ 9 On December 13, 2000, Appellee filed a first and final account of its administration of the $800,000, and therein sought termination and attorneys' fees. Appellee indicated that it received approximately $800,000 in principal, which realized a net gain of approximately $5,000. From this principal, it requested guardianship termination fees and legal fees for litigation expenses of approximately $55,000. It had transferred approximately $20,000 from principal to interest to cover overdrafts. It received approximately $615,000 in income, which was distributed to or for the benefit of Mr. Scharlach or in payment of income taxes or guardianship fees.

¶ 10 Appellant filed exceptions to the first and final account. Therein, Appellant alleged that Appellee and its predecessor had an ongoing duty to assess and provide for the present and future needs of Mr. Scharlach by investing the guardianship assets prudently. She asserted that Appellee never considered a comprehensive report submitted on December 1, 1989, by William Sykes, an investment consultant, which placed Appellee on notice regarding Mr. Scharlach's financial requirements. Finally, Appellant maintained that Appellee failed to invest the assets in a reasonable and prudent manner calculated to produce income and growth necessary to address the needs created by Mr. Scharlach's severe, continuing, and irreversible disabilities. Appellant also objected to the payment of a termination fee and of attorneys' fees, and she sought the imposition of a surcharge.

¶ 11 Cross-motions for summary judgment were filed. Appellee moved for summary judgment, alleging the following. In transferring the funds from New York to Pennsylvania, the New York court suggested that the guardian of the estate be restricted to investing in federally-insured investments with no more than $100,000 being deposited in any one place. In accordance with that suggestion, the or-

the trust and by pursuing an overall investment strategy reasonably suited to the trust.

(b) **Permissible investments.**—A fiduciary may invest in every kind of property and type of investment, including, but not limited to, mutual funds and similar investments, consistent with this chapter.

(c) **Considerations in making investment and management decisions.**—In making investment and management decisions, a fiduciary shall consider, among other things, to the extent relevant to the decision or action:

(1) the size of the trust;

(2) the nature and estimated duration of the fiduciary relationship;

(3) the liquidity and distribution requirements of the trust;

(4) the expected tax consequences of investment decisions or strategies and of distributions of income and principal;

(5) the role that each investment or course of action plays in the overall investment strategy;

(6) an asset's special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries;

(7) to the extent reasonably known to the fiduciary, the needs of the beneficiaries for present and future distributions authorized or required by the governing instrument; and

(8) to the extent reasonably known to the fiduciary, the income and resources of the beneficiaries and related trusts.

phans' court in this action entered the February 8, 1990 order requiring the guardian to invest in federally-insured funds or direct obligations of the United States Government. Appellee further alleged:

In the business records of First Eastern relative to the initiation of this Guardianship there is contained in the "New account information sheet No. 1," which was kept in the ordinary course of business of First Eastern Bank, the following entry of George Sheraw, the [initial] Account Administrator, "I spoke with the judge and we discussed a 50–50 split—U.S. Government bonds/high quality individual stocks—**he agreed that would be a good position for the account, but, for the moment, meaning until the DOW average goes down from its all time, all time peak, just bonds.**"

Motion for Summary Judgment of PNC Bank, N.A., 5/15/01, at ¶ 7 (emphasis added). Appellee also indicated that Appellant received annual statements showing that the account was invested in federally-insured funds and direct obligations of the United States Government.

¶ 12 Thus, Appellee contended that it was entitled to summary judgment since 1) it was required by the terms of the February 8, 1990 order to invest in government-insured investments or direct obligations of the United States Government; and 2) it invested as it did in order to obtain income needed for the care and maintenance of Mr. Scharlach.

¶ 13 Appellant filed a counter-motion for summary judgment on the surcharge issue. She alleged, as in her objections to

the account, that Appellee breached its fiduciary duties by failing to invest the corpus in equities, which resulted in a failure to realize a gain in value in the principal, and by failing to petition the court to obtain permission to invest in equities.

¶ 14 On July 26, 2001, the court entered an order granting Appellee's motion in part, but disallowing the termination and attorney's fees. That same order denied Appellant's motion with respect to the surcharge issue. The orphans' court concluded that Appellant had acquiesced in the investment scheme by failing to take any action against Appellee and, therefore, was guilty of laches. The appeal at No. 2733 EDA 2001 and cross-appeal at No. 2734 EDA 2001 followed.[3]

¶ 15 Our standard of review of the grant of summary judgment is as follows:

A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions. As with all questions of law, our review is plenary. Furthermore, [in deciding a motion for summary judgment,] we will view the record in the light most favorable to the nonmoving party, and accept as true all well-pleaded allegations, giving that party the benefit of all reasonable inferences that can be drawn from those allegations. In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. *See* Pa.R.C.P. 1035.2. The rule states that where there is no genuine

**3.** In addition to filing the appeal, Appellant filed exceptions to the July 26, 2001 order. In an order entered August 16, 2001, the orphans' court concluded that the July 26, 2001 order was a final order since it granted

summary judgment to Appellee and determined that exceptions were not required. Appellant also filed an appeal from the August 16, 2001 order. We dismiss that appeal as moot.

issue of material fact as to a necessary element of the cause of action and the moving party is entitled to relief as a matter of law, summary judgment may be entered. *See* Pa.R.C.P. 1035.2(1). *Kenner v. Kappa Alpha Psi Fraternity*, 2002 PA Super 269, 808 A.2d 178 (citations omitted).

¶ 16 Supporting documents contained in the certified record establish the following. When the guardianship account was created, William Sykes, a certified financial planner and registered investment advisor, prepared a report at the direction of Appellee under the following circumstances. First, Appellant and her husband met with Mr. Sheraw, the initial trust officer, and told him about Mr. Scharlach's needs. Mr. Sheraw wrote a letter to Mr. Sykes, in which he set forth the needs, and asked Mr. Sykes to prepare an investment plan to meet those needs. Mr. Sheraw's letter to Mr. Sykes states:

> ¶ 17 The principal amount is $800,000.00; **The present need for income is not great and more emphasis is desired upon growth, with safety of principal, than on maximizing income;**
>
> The need for household employees is not presently constant but occurs when parents take holidays;
>
> The condition of the individual does not require constant or more than normal medical attention.

Motion for Summary Judgment of Helen Scharlach, 5/14/01, Exhibit 21 at 1.

¶ 18 Mr. Sykes prepared an investment recommendation designed to meet Mr. Scharlach's needs as outlined by Mr. Sheraw in his letter. Mr. Sykes's report indicated that to assure adequate funding for Mr. Scharlach's lifetime care, the following investment scheme should be implemented: 1) $350,000 invested in tax-free munici-

pal bonds; 2) $400,000 invested in an equity investment mutual fund with well-rated growth and income and with a proven track record that would provide protection from inflation; and 3) $50,000 invested in a money market account.[4] The Sykes plan was distributed to Appellee in December 1989, and as confirmed in its account, Appellee paid for preparation of the report.

¶ 19 In response to the indication in Appellee's record indicating that the orphans' court in this action would allow investment in stocks only after the Dow Jones average declined from its peak, Appellant provided an affidavit from Mr. Sykes. Mr. Sykes stated that on January 11, 1990, when the conversation between Mr. Sheraw and the orphans' court occurred, the Dow Jones average was 2760. That average went to 2543 on January 30, 1990, and declined on October 11, 1990, to 2365.

¶ 20 Other documents attached to Appellant's motion for summary judgment confirm that Appellee continued to recognize the need to invest in stock in order to meet Mr. Scharlach's long-term needs. It sent several letters to E. David Christine, Esquire, who had represented Appellant when the guardianship was initiated. In all those letters, representatives of Appellee acknowledged that equity stocks should be purchased for the guardianship. In the letters, the representatives asked Mr. Christine either what should be done or what was being done in order to obtain relief from the February 8, 1990 order restricting investments.

¶ 21 The record also contains copies of account review forms dated March 15, 1991, March 3, 1992, and March 25, 1993, from Appellee's files. Those review forms clearly indicate that Appellee was aware

---

4. These investments were legal at the time. *See* 20 Pa.C.S. §§ 7306, 7307, 7310.

that it needed to invest in a diversified equity fund and it needed to obtain approval from the orphans' court in order to do so. On the March 25, 1993 form, the trust officer indicated that he was going to work with the account administrator to devise a proposal for the orphans' court.

¶ 22 Other documents in the record indicate the following. Holly Overfield, an employee of Appellee, executed the money transfers and disbursements from Mr. Scharlach's account as authorized by the trust officer in charge of the account. Ms. Overfield stated that in March 1998, Appellant was "concerned with the allocations of the assets of the account. She felt that she was not getting enough or enough money was not being made on the account." Deposition of Holly Overfield, 4/25/01, at 8. Ms. Overfield described Appellant as "a little irate." *Id.* at 10. At that time, Ms. Overfield made a note and gave it to William Zachaeis, who was the trust officer in charge of the account at that time.

¶ 23 Appellant's deposition indicates that she never made any demands for a certain amount of income. To the contrary, with only one exception, she consistently assented to the income allotted to her by the various trust officers in charge of the account. When Appellant and her husband initially met Mr. Sheraw to set up the account, they told the officer about Mr. Scharlach's needs and condition. Mr. Sheraw told Appellant that she would receive $5,000 a month, and she agreed to that amount. That amount later was reduced to $3,400 a month and then to $2,700 a month. Appellant stated that she never asked for more monthly income and always managed on what she was given. At one point, in 1997, Mr. Zachaeis, who then was in charge of the account, told her that her income might be reduced to $2,400 a month. Only at that point did Appellant

state that she required $2,700 to meet Mr. Scharlach's needs.

¶ 24 The deposition of Dr. Kenneth W. Lilik established that Mr. Scharlach is a severely disabled adult with no serviceable speech, who has rigidity and involuntary movement in his limbs. Mr. Scharlach also has hearing loss and difficulty tracking his eyes. He has the language ability of an eighteen-month-old child, the social ability of a twenty to twenty-three-month-old child, the fine motor functioning of a twenty-one-to-twenty-three-month-old child, and the gross motor ability of a twenty-four-to-twenty-five-month-old child. There is no treatment for Mr. Scharlach's condition, and it will worsen with time.

¶ 25 With these uncontested facts in mind, we must first address the propriety of the orphans' court application of the doctrine of laches. We believe that laches was applied improperly in this case. It is axiomatic that a court should not decide a case on the basis of issues not raised by the parties. *See Skepton v. Borough of Wilson,* 562 Pa. 344, 755 A.2d 1267 (2000); *Knarr v. Erie Insurance Exchange,* 555 Pa. 211, 723 A.2d 664 (1999). Herein, Appellee did not raise the applicability of laches in any pleading filed before the orphans' court; thus, it clearly waived that issue.

¶ 26 Furthermore, the doctrine of laches, contrary to Appellee's position on appeal, should not have been applied in the present case. Our Supreme Court has outlined the parameters of the doctrine:

Laches bars relief when the complaining party is guilty of want of due diligence in failing to promptly institute the action to the prejudice of another. Thus, in order to prevail on an assertion of laches, respondents must establish: a) a delay arising from petitioner's failure to exercise due diligence; and, b) prejudice

to the respondents resulting from the delay. Moreover, the question of laches is factual and is determined by examining the circumstances of each case.

*Sprague v. Casey*, 520 Pa. 38, 45, 550 A.2d 184, 187–88 (1988) (citations omitted). Prejudice in this context means that the party must change his position to his detriment in order to invoke laches. *Id.* Furthermore, the doctrine is an equitable doctrine that should not be applied in favor of a person who has failed to take required action on his own. *Id.*

¶ 27 In the present case, Appellee was the corporate fiduciary which had the affirmative duty to act in the best interests of Mr. Scharlach. After being fully informed of Mr. Scharlach's needs and after being given an exact outline of which investments would meet those needs, it did nothing. It clearly was put on notice by the February 8, 1990 order that the court would lift the investment restrictions if conditions warranted such an action. Appellee's intake memorandum confirmed that the orphans' court was willing to lift the restrictions once the Dow Jones industrial average decreased from its peak and that the court would change the investment options to conform with Mr. Sykes's recommendation. The market virtually plunged in October 1990, yet Appellee did nothing. It mailed form letters year after year merely asking counsel to delineate the status of the request to be relieved of the investment restriction. Appellee received no response from the lawyer and failed to follow up on the letters in any manner. In an annual review form prepared on March 25, 1993, the trust officer again acknowledged that the discharge of Appellee's fiduciary duty required that the orphans' court be approached that he and the account administrator would make the proposal. There was no proposal in the record.

¶ 28 Furthermore, letters to Mr. Christine establish beyond a doubt that Appellant and her husband asked Appellee to seek the lifting of the investment restriction. Specifically, a letter dated May 30, 1997, to E. David Christine, Jr., from Edward J. De Luccia, who was then in charge of the guardianship account, indicated that the guardianship account of Jon Scharlach was under an order dated February 8, 1990, restricting investments. Mr. De Luccia states, "It is the **Scharlachs'** desire to protect their son from inflation. We suggest it would be appropriate to begin investing a portion of the money in common stock." Deposition of Helen C. Scharlach, 4/18/01, Exhibit J, at 1 (emphasis added). An identical letter was sent on June 13, 1997. In addition, Ms. Overfield's deposition indicated that in 1998, Appellant appeared at Appellee's office and was visibly upset over Appellee's failure to invest any funds in equities.

¶ 29 Our Supreme Court has stated, "A court may deprive a party of equitable relief where, to the detriment of the other party, the party applying for such relief is guilty of bad conduct relating to the matter at issue. The doctrine of unclean hands requires that one seeking equity act fairly and without fraud or deceit as to the controversy in issue." *Terraciano v. Commonwealth Department of Transportation*, 562 Pa. 60, 69, 753 A.2d 233, 238 (2000) (citations omitted); *see also Mudd v. Nosker Lumber, Inc.*, 443 Pa.Super. 483, 662 A.2d 660 (1995) (unclean hands doctrine forecloses equitable relief when wrongdoing directly relates to matter in controversy, affects relationship between parties, and doctrine can be raised by the court *sua sponte*).

¶ 30 In this case, Appellee is a sophisticated financial institution that was operating in a fiduciary capacity and now is seeking application of the equitable doc-

trine of laches in this case grounded in equity. *See* Restatement (Second) of Trusts § 197 (the remedies of a beneficiary against a trustee are exclusively equitable). The record indicates that Appellant, **in fact,** did apprise Appellee numerous times that she wanted her son's money invested in equities. Notwithstanding the waiver issue, we find that laches was applied improperly in this equitable case since Appellee bore the onus of taking action more so than Appellant, who clearly registered her complaints with Appellee.

¶ 31 We now turn to the surcharge question. The principles applicable to such a question were delineated in *Estate of Pew,* 440 Pa.Super. 195, 655 A.2d 521, 541 (1994) (citations omitted):

A surcharge is the penalty imposed for failure of a trustee to exercise common prudence, skill and caution in the performance of its fiduciary duty, resulting in a want of due care. The standard of care imposed upon a trustee is that which a man of ordinary prudence would practice in the care of his own estate. If a fiduciary has greater skill than that of a person of ordinary prudence, then the fiduciary's standard of care must be judged according to the standard of one having this special skill.

*See* Restatement (Second) of Trusts § 174. As a financial institution that specialized in fiduciary accounts, Appellee had a higher standard of care in this case. *In re Mendenhall,* 484 Pa. 77, 398 A.2d 951 (1979).

¶ 32 We conclude that the documents and pleadings herein establish that Appellee abrogated its fiduciary duties. Specifically, Appellee breached its duty to exercise common prudence, skill, and caution in the performance of its fiduciary duty that resulted in a lack of due care when it failed to implement the investment plan prepared by Mr. Sykes. It should have sought relief from the February 8, 1990 order restricting investments after the Dow Jones industrial average fell, and its failure to do so warrants the imposition of a surcharge in this case.

¶ 33 Appellee raises a myriad of arguments in defense of its actions. Appellee first invokes the protection of the February 8, 1990 order itself, maintaining that it was reasonable for it to interpret that order as prohibiting the bank from investing in anything other than government securities. When combined with the evidence of Mr. Sheraw's conversation with the judge in 1990, we are willing to accept Appellee's interpretation of the order. However, the dereliction of duty occurred herein when Appellee failed to seek relief from this order after the Dow Jones industrial average plunged later that same year.

¶ 34 Appellee posits that "a surcharge cannot be premised on [its] failure to request the court to amend the Order" since it is "sheer speculation" that a petition to amend the order would have been granted. Appellee's brief at 13. We categorically reject this position. First, the order indicated, "First Eastern Bank is hereby granted leave to petition this Court for an amendment to this Order should conditions merit an appropriate adjustment of the investment scheme for the assets." Order of Court, 2/8/90, at 1. Thus, the order virtually invited Appellee to seek to lift its investment restrictions at an appropriate time.

¶ 35 The fact that the orphans' court was willing to lift the restrictions is cemented by the intake memorandum prepared by Mr. Sheraw, the initial trust officer on this account. That memorandum states that Mr. Sheraw "spoke with the judge and ... discussed a 50–50 split—U.S. Government bonds/high quality individual stocks—he agreed that would be a good position for the account, but, for the moment, meaning

until the DOW average goes down from its all time, all time peak, just bonds." Motion for Summary Judgment of PNC Bank, N.A., 5/15/01, at ¶ 7. Mr. Sykes's affidavit indicated that by October 1990, the market had fallen by fifteen percent and 400 points. Appellee did nothing.

¶ 36 Further, the documents of record irrefutably establish that Appellee was aware that its fiduciary obligations required it to seek relief from the order so that it could invest the guardianship assets in accordance with Mr. Sykes's investment plan. Appellee's account review forms dated March 15, 1991, March 3, 1992, and March 25, 1993, indicate that Appellee was aware that it required approval from the orphans' court in order to invest in a diversified equity fund. In the March 25, 1993 form, the trust officer indicated that he and the account administrator would devise a proposal for the orphans' court. However, the record contains no such proposal. Instead, Appellant wrote four letters to Mr. Christine. On November 29, 1993, the trust officer wrote to Mr. Christine stating, in pertinent part, "In reviewing the files of the guardianship for Jon Erik Scharlach, it seems as if prior approval from the judge is necessary in order to purchase equities in this account. Please advise if this is correct and what must be done in order to make an equity purchase." Deposition of Helen C. Scharlach, 4/18/01, Exhibit H, at 1. The same officer sent a letter to Mr. Christine on May 23, 1994, which reads:

> The last time we reviewed this account it was determined that we thought it prudent to add some equity exposure to the guardian account. It appears that we are still waiting for approval from the judge before we can make any equity purchase for the guardian account of Jon Erik Scharlach. Please advise us as to the status of the approval.

Deposition of Helen C. Scharlach, 4/18/01, Exhibit I, at 1. Then, on May 30, 1997, and June 13, 1997, the trust officer in charge of the account wrote to Mr. Christine, quoted the order restricting investment, and stated that it was Appellant's desire to invest in common stock. Appellee did not get a response to these four letters and did nothing. Finally, in 2000, Appellee successfully petitioned for relief from the February 8, 1990 order.

¶ 37 The actions of Appellee bear no resemblance to the actions of the fiduciaries in the cases upon which it relies, where the fiduciaries were found to have met the standard of care required of them, even though, in hindsight, alternative investments would have yielded higher return. Those fiduciaries followed investment strategies that were well-considered when implemented. *See, e.g., Pew, supra.*

¶ 38 In the present case, however, Appellee ignored the sound and considered plan that was prepared at its direction in 1990 by Mr. Sykes. Appellant is not seeking damages for alternative investments. She seeks the loss that Mr. Scharlach sustained due to Appellee's failure to follow the very investment plan that it requested.

¶ 39 Alternatively, Appellee maintains that it acted reasonably in investing in federally insured and government obligations since those assets "generated a steady and guaranteed source of income ... needed and required for the maintenance of Jon Erik Scharlach." Appellee's brief at 11. The record belies the assertion that significant income was needed for Mr. Scharlach's maintenance. First, when Mr. Sheraw wrote to Mr. Sykes and requested a financial plan, he stated in relevant part, "The present need for income is not great and more emphasis is desired upon growth, with safety of principal, than on maximizing income." Motion for Summary Judgment of Helen Scharlach,

5/14/01, Exhibit 21, at 1. The fact that the need for income was not great was further confirmed by Mrs. Scharlach's testimony. She acquiesced completely in the amount of income that the trust officers remitted to her. She budgeted according to the amount the guardianship account provided. She did not protest until the income went below $2,700 a month.

¶ 40 Next, Appellee contends that a surcharge cannot be premised upon unrealized gain in the value of principal. We disagree. We are guided by the Restatement (Second) of Trusts (the "Restatement") in resolving this contention. Restatement § 204 provides that a trustee is not liable for a loss in value of the trust property or for a failure to make a profit that does not result from a breach of trust. Conversely, Restatement § 205 provides, "If the trustee commits a breach of trust, he is chargeable with (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; or (b) any profit made by him through the breach of trust; or (c) any profit which would have accrued to the trust estate if there had been no breach of trust." Comment (a) explains that in choosing among these three remedies, the beneficiary has the option of pursuing the remedy that will place him in the position in which he would have been if the trustee had not committed the breach.

¶ 41 Finally, Restatement § 211 provides in relevant part, "If the trustee fails to purchase specific property which it is his duty to purchase, the beneficiary can charge him with its value at the time of the decree together with the income which would have accrued thereon if he had purchased it[.]" Referencing Restatement § 205(c), comment (b) to § 211 indicates that as a measure of liability, when the trustee fails to purchase property that it is his duty to purchase, the beneficiary then is entitled to be placed in the same situation as he would have been had the trustee purchased the property when it was his duty to purchase it.

¶ 42 In the present case, since we have determined that Appellee breached its duty to exercise reasonable care and skill in administering the trust by failing to invest principal in accordance with Mr. Sykes's investment plan, Appellant is entitled to the remedy requested in this action, which is for Mr. Scharlach to be placed in the position in which he would have been had the investment plan been followed.

¶ 43 In leveling this argument, Appellee quotes language in cases indicating that a surcharge is imposed on "loss," and suggests that a loss is not sustained when, as here, principal is intact. While we do not intend to engage in a semantic battle on the meaning of the term "loss," and while we rely upon the sound principles espoused in the Restatement to resolve this claim, we do note the following. Absent Appellee's breach of its duty, the successor guardian of the estate would now have in its possession assets valued substantially in excess of those received. A surcharge is permitted when a fiduciary fails to exercise due care, and loss is incurred.

¶ 44 In this case, Mr. Scharlach's loss is apparent as his principal would now be worth substantially more if the fiduciary had invested in accordance with the investment plan that it ordered and recognized as reasonably designed to protect Mr. Scharlach's interests. We note that if a fiduciary allows principal to remain uninvested, a surcharge would be warranted as to the income that the fiduciary failed to realize due to his failure to invest. *See In re Mendenhall, supra.* Lost income is just as much unrealized gain as unrealized principal growth.

¶ 45 Finally, Appellee observes that under precedent prevailing at the time of its actions, a surcharge cannot be imposed merely due to a failure to diversify. *Es-*

*tate of Knipp*, 489 Pa. 509, 512–14, 414 A.2d 1007, 1009 (1980), contains the relevant principles:

> Where, as in the present case, a testator vests a fiduciary with discretion to retain assets, the fiduciary is not thereby excused from the duty of making the retention decision prudently. *Lentz's Estate*, 364 Pa. 304, 72 A.2d 276 (1950). It is not, however, *per se* imprudent for an executor, vested with absolute discretion to hold property, to refrain from immediately diversifying a large block of stock received at the commencement of administration. In *Saeger's Estate*, 340 Pa. 73, 76–77, 16 A.2d 19, 21–22 (1940), where a surcharge was sought solely on the ground that the trustee had not diversified holdings, we said:
>
> > Nor does it appear that in any case thus far brought before this Court has a trustee been surcharged solely for the reason now urged. In the absence of controlling precedent and particularly in the absence of such requirement in the statutory law relating to the investment of trust funds, we conclude that ... there is no authority; in the law of this State for the doctrine contended for by appellants, that trust investments, otherwise legal and entirely proper under all the recognized standards, are necessarily improvident *per se* for any claimed lack of proper diversification.

*See also In re McCune*, 705 A.2d 861 (Pa.Super.1997).

¶ 46 However, in the present case, Appellant is hardly complaining that Appellee breached its duty *per se* for failing to diversify. Appellant contends that Appellee breached its fiduciary duty by failing to invest the assets of the guardianship in accordance with the investment plan that it ordered, and that the documents of record irrefutably establish was reasonably designed to meet the incompetent's needs. The principles at issue in *Knipp* have no application herein.[5]

¶ 47 In its cross-appeal, Appellee argues that since it had successfully defended against this surcharge action, it was entitled to termination fees as well as attorney's fees incurred in the surcharge action. Our above determination has rendered this argument moot.

¶ 48 In accordance with the foregoing, the July 26, 2001 order is affirmed in part and reversed in part. We conclude that as a matter of law, Appellee breached its fiduciary duty by failing to obtain relief from the February 8, 1990 order and by failing to invest in accordance with the investment plan of William Sykes. The July 26, 2001 order is reversed in so far as it granted summary judgment to Appellee and failed to grant summary judgment to Appellant. The order is affirmed to the extent it denied Appellee termination fees and attorney's fees. The case is remanded for a determination of damages.

¶ 49 The order of July 26, 2001, is affirmed in part and reversed in part. Case remanded for further proceedings in accordance with this opinion. Appeal at number 2880 EDA 2001 dismissed. Jurisdiction relinquished.

---

5. Indeed, the *Knipp* analysis has been replaced by recent developments in the law relating to trust investments. *See* 20 Pa.C.S. §§ 7203 (prudent investor rule), 7204 (diversification standards); Restatement (Third) of Trusts §§ 227, 229. Sections 7203 and 7204 of the Probate, Estates and Fiduciaries Code did not become effective until December 25, 1999, and therefore, we cannot apply them to Appellee's actions, which occurred prior to their effective date. Our holding herein is based upon the facts presented rather than these statutory enactments.