J-S28021-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| BARRY R. STARLIPER AND SUZANNE L. STARLIPER | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| KEVIN L. NEGLEY, MELISSA A. NEGLEY, GERALD DUPERT AND LORA DUPERT | : : : : : | No. 1853 MDA 2018 |
| Appellants | : | |

Appeal from the Judgment Entered October 9, 2018
In the Court of Common Pleas of Cumberland County Civil Division at
No(s):  2016-4031

BEFORE:   BOWES, J., McLAUGHLIN, J., and STRASSBURGER*, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED OCTOBER 04, 2019**

Kevin L. and Melissa A. Negley appeal[1] from the judgment entered in the action brought against them by Barry R. and Suzanne L. Starliper. The Negleys contest the orders declaring an easement on their property, requiring them to remove a fence and detach their addition from the Starlipers' addition, and awarding the Starlipers' monetary damages for trespass. We affirm.

The properties at issue in this dispute originally comprised the Sunnyside Female Seminary, which was founded in 1858 in the Borough of Newburg, Pennsylvania. Trial Court Opinion, filed 7/30/18 at 1. The seminary

---

\*   Retired Senior Judge assigned to the Superior Court.

[1] Although Gerald Dupert and Lora Dupert also appealed, the trial court found that all claims against the Duperts were in favor of the Duperts. We therefore refer to the appellants as "the Negleys."

included a three-story building, a two-story "addition" protruding from the rear of the building's eastern half, and a backyard. The earliest recorded division of the property occurred in 1872, when the western half of the property (including the western half of the building) was conveyed. The Starlipers now hold the title to the eastern half of the property, including the original addition, which they acquired in June 2006.

The western portion became the property of Gerald and Lora Dupert in June 2015. The previous owner had started construction of a two-story addition on the rear of the residence, abutting the Starlipers' addition. The previous owner died before completing the addition. When the Duperts took ownership, the addition consisted of studding, plywood, and a roof. In July and August 2015, the Duperts' daughter and son-in-law, Melissa and Kevin Negley, finalized the construction on the addition.

The Duperts conveyed their property to the Negleys in February 2016. Between April and May 2016, the Negleys constructed a fire escape from the second story of the addition and erected a fence between the properties, alongside the property line. The Negleys also constructed a detached garage and carport at the rear of their backyard.

The Starlipers commenced this action in July 2016 by filing a complaint asserting counts for trespass, nuisance, and obstruction of an easement. Following further pleadings, the Starlipers filed a "Motion for Declaratory Relief to Affirm Status of Easement." The Starlipers alleged that the only way to access the exterior western wall of their addition, in order to maintain it, was

by accessing part of the Negleys' property. The Starlipers alleged that as their addition has existed since before the time the property was first divided, a five-foot wide easement by implication existed on the portion of the Negleys' property that runs adjacent to it. The Starlipers asserted that access to the western wall of their addition has always been necessary, and that the wall now includes two windows, air vents, vinyl siding, and a rain gutter.

The Negleys filed an Answer to the Motion for Declaratory Relief. They claimed that the Starlipers had never performed maintenance on the wall, and there was no evidence that any prior owners had ever accessed their property to perform any such maintenance.

The trial court granted the motion on the pleadings and entered an order declaring the Starlipers "have an easement of five feet in width, across the lot owned by the [Negleys] to access the western wall of [the Starlipers'] addition." Order, 11/8/17, at 6.

Six months later, the case proceeded to trial. Barry and Suzanne Starliper and Melissa and Kevin Negley each testified.[2] The Starlipers testified that the Negleys' addition impedes their access to the easement, as does the fire escape and fence. The Starlipers also testified that the Negleys' addition was fastened to the Starlipers' addition, and that during construction of the garage, the Negleys' contractor spread soil, rocks, and debris onto the

_____

[2] We refer to the testimony of Barry and Suzanne Starliper together as the "Starlipers' testimony" and to the testimony of Melissa and Kevin Negley together as the "Negleys' testimony."

- 3 -

Starlipers' back lawn. The Starlipers conceded that some of the rocks in their backyard were there prior to the construction. The Starlipers further testified that construction of the garage increased the flow of water onto their land. The Starlipers testified that they received an estimate of $1,480 from a landscaper to haul away the debris, apply topsoil to grade the yard, and replant grass. The Starlipers entered a copy of the estimate into evidence.

The Negleys denied that their addition is attached to the Starlipers' home, asserting that it is anchored to the rear of their own home. They testified that they could easily remove a panel of the fence within minutes, and offered to do so periodically to allow the Starlipers access to their exterior wall. The Negleys stated that when construction on the garage began, they instructed their contractors to keep any dirt off the Starlipers' property, but the contractors put some debris across the property line anyway. The Negleys had the contractors remove as much of the debris as they could, but acknowledged that some remained in the Starlipers' backyard. The Negleys denied that construction of the garage altered the flow of water between the properties; the Negleys testified they only slightly raised the elevation of the ground under the garage, and testified that their rear lawn has always sloped onto the Starlipers' rear lawn.

The Negleys also argued that the Starlipers' claims should be banned by the doctrine of laches, as the Starlipers had delayed in asserting the existence of an easement until the Duperts/Negleys had purchased the property, finished the addition, and began construction of the fire escape and fence.

Much of the testimony therefore revolved around the manner in which the Starlipers had protested the various phases of construction, both before and after the Duperts/Negleys acquired the property.

Relevant to our disposition, the Starlipers testified that they voiced their concerns to the Negleys in the spring of 2016, soon after the Negleys obtained ownership and began construction of the fire escape, fence, and garage. The Starlipers stated that they also attended a meeting of the Borough in May 2016, at which the Negleys were present, to publicly object to the construction, and sent the Negleys a cease and desist letter. The Negleys testified that the Starlipers' complaints to the Borough were limited to arguments regarding zoning and permits, and did not mention a right of way. However, the Negleys also testified that when they began construction of the fire escape, fence, and garage, the Starlipers complained that the construction impeded their "right of way," and that the additional construction would prevent them from accessing their dryer vent.

The court found that although the Negleys' addition sits upon the Starlipers' easement, ordering the Negleys "to remove up to five feet of the addition is inconvenient and would cause greater injury to the Negleys than is reasonable under the circumstances." Opinion, 7/30/18, at 15. However, the court enjoined the Negleys "from adding to the addition to the extent it trespasses on the [Starlipers'] property or impedes any easements." Order, 7/30/18, at 1 (unpaginated). The court also found that the Negleys' fire escape sits upon the easement, but that it does not unreasonably infringe on the

Starlipers' use of the easement. Opinion, 7/30/18, at 15. In contrast, the court found that the Negleys' fence "significantly infringes upon the Starlipers' use of the easement . . . such as to require its removal." *Id.* The court ordered the Negleys "to remove the fence completely, or, alternatively, move the fence to the end of the [Starlipers'] structure, therefore removing the easement impediment." Order, 7/30/18, at 1 (unpaginated).

The court also found, based on the photographic evidence, that the Negleys' addition was fastened to the Starlipers' addition, and that this constituted trespass. Opinion, 7/30/18, at 12. The court ordered the Negleys "to remove any parts of the addition that are fastened to [the Starlipers'] home as well as any parts of the addition that unreasonably impede the Starlipers' access to their western wall for maintenance and repair." Order, 7/30/18, at 1.

The court found that the Negleys' diversion of surface water onto the Starlipers' land constituted trespass, as well as the soil, rocks, and debris that the Negleys' contractors left on the Starlipers' property during the construction of the garage. Opinion, 7/30/18, at 10. The court ordered the Negleys to pay the Starlipers damages of "$1,480.00 for this trespass of soil, rocks and debris, minus the cost of any repair not directly related to [the Negleys']

actions." Order, 7/30/18, at 1. The court concluded that laches did not bar any of the Starlipers' claims. Opinion, 7/30/18, at 5.[3]

The Negleys filed a motion for post-trial relief, which the court denied. The court thereafter entered final judgment in favor of the Starlipers, and the Negleys appealed.

The Negleys raise the following issues for our review:

I. Whether the Trial Court erred in finding an easement running on [the Negleys'] lot to the benefit of [the Starlipers'] lot?

II. Whether the Trial Court erred in awarding [the Starlipers] $1,480.00 in damages when the only estimate provided at trial including cleaning up debris on [the Starlipers'] property that was not placed there by [the Negleys] and existed prior to [the Negleys'] purchase of the property?

III. Whether the Trial Court erred in finding the doctrine of laches inapplicable when [the Starlipers] delayed prosecuting or instituting their claim for at least 8 years?

IV. Whether the Trial Court erred in finding [the Negleys] trespassed by diverting surface water onto [the Starlipers'] land?

V. Whether the Trial Court erred in finding that the addition trespasses on the [the Starlipers'] property when [the Starlipers] provided no proof that the addition was fastened to their property and the addition is not fastened to their property?

VI. Whether the Trial Court erred in ordering [the Negleys] to remove a fence which can easily be removed at any time [the Starlipers] wish to access their wall?

Negleys' Br. at 3-4.

_____

[3] The court found in favor of the Negleys on the Starlipers' claims of nuisance and punitive damages/attorneys' fees. These findings are not at issue on appeal.

Our standard of review in matters of equity is well settled:

The trial judge, sitting in equity as a chancellor, is the ultimate fact-finder. The scope of review, therefore, is limited. The final decree will not be disturbed unless the chancellor committed an error of law or abused his or her discretion. The findings of fact made by the trial court will not be disturbed unless they are unsupported by competent evidence or are demonstrably capricious.

**Gurecka v. Carroll**, 155 A.3d 1071, 1075 (Pa.Super. 2017) (*en banc*) (quoting **Griffith v. Kirsch**, 886 A.2d 249, 253 (Pa.Super. 2005)).

**I. The trial court properly declared an implied easement.**

The Negleys first contend that the trial court erred in declaring that the Starlipers have an easement by implication. The Negleys argue that the easement is unnecessary because the court had other options to ensure the Starlipers' ability to access the outside of their wall. The Negleys contend that the Starlipers have not explained "why they cannot maintain the vents from inside the home or why they need a five foot easement to accomplish this task." Negleys' Br. at 12.

The Negleys also argue that the Starlipers "failed to provide any evidence that they or any of their predecessors in title had ever undertaken such use or that any such use was open, visible, continuous, and permanent." *Id.* at 11. They maintain that "there is absolutely no evidence that the use claimed by [the Starlipers] has been long continued or so obvious and manifest to show that this use was meant to be permanent." *Id.* Finally, the

Negleys contend that the Starlipers' proposed use of the easement "would be discontinuous and only used from time to time." *Id.* at 12.

"Easements by implied reservation . . . are based on the theory that continuous use of a permanent right-of-way gives rise to the implication that the parties intended that such use would continue, notwithstanding the absence of necessity for the use." *Bucciarelli v. DeLisa*, 691 A.2d 446, 449 (Pa. 1997) (quoting *Burns Mfg. Co., Inc. v. Boehm*, 356 A.2d 763, 767 (Pa. 1976)). Such easements can only arise at the time ownership over two tracts of land is first severed. *Phillippi v. Knotter*, 748 A.2d 757, 762 (Pa.Super. 2000). Although the complaining party bears the burden of establishing the existence of an easement by implication, when the right to such an easement "is of ancient origin and is too remote to be capable of direct proof," the plaintiff's burden is relaxed. *Possessky v. Diem*, 655 A.2d 1004, 1008 (Pa.Super. 1995).

An easement by implication exists if the party claiming such an easement establishes three things: (1) a separation of title; (2) prior to the separation, the use giving rise to the easement was "so long continued, and so obvious or manifest, as to show that it was meant to be permanent"; and (3) the easement is "necessary to the beneficial enjoyment of the land granted or retained." *Gurecka*, 155 A.3d at 1076 (quoting *Daddona v. Thorpe*, 749 A.2d 475, 481 (Pa.Super. 2000)) (emphasis removed). A fourth factor may be added: "that the servitude shall be continuous and self-acting, as distinguished from discontinuous and used only from time to time." *Id.*

(quoting **Daddona**, 749 A.2d at 481).[4] We presume that parties to a conveyance expect and intend knowable and reasonably foreseeable prior uses of the land to continue after the conveyance. **Bucciarelli**, 691 A.2d at 448 (citing Restatement (First) of Property, § 476, Comment j).

Regarding the element of necessity, an easement by implication need not require a showing of "absolute necessity," or that it is "essential for the beneficial use of the property." **Daddona**, 749 A.2d at 480 (quoting **Burns**, 356 A.2d at 767), 482 (quoting **Mann–Hoff**, 604 A.2d at 708 n.4). Rather, the party seeking the easement must only show that the easement is "convenient or beneficial to the dominate estate." **Id.** at 482 (quoting **Mann-Hoff**, 604 A.2d at 708 n.4).

Here, the trial court found that there was no dispute regarding the unity of title at the time the properties were separated. Order, 11/8/17, at 4. The court further concluded that the easement was necessary to enable the Starlipers "to clean, inspect, and repair the exterior." **Id.** at 6. The court also found that the Starlipers had met their burden in proving the easement was obvious and intended to be permanent, because "the [Starlipers'] addition existed for [14] years prior to the first division of the land, and subsequent

---

[4] Pennsylvania courts may also consider the "balancing approach, designed to ascertain the actual or implied intentions of the parties," found in the Restatement of Property in determining the existence of an easement by implication. **Gurecka**, 155 A.3d at 1076, 1078 n.1 (quoting **Mann–Hoff v. Boyer**, 604 A.2d 703, 707 (Pa.Super. 1992)); **see also** Restatement (First) of Property § 476 (1944).

owners of the land are presumed to know and contemplate reasonably necessary uses of the property." *Id.* at 5.

The trial court did not commit an error of law or an abuse of discretion. Although there was no testimony regarding maintenance of the wall before 1872, when the western half of the property was conveyed, a reasonable landowner would have required access to the exterior wall of the home for ordinary maintenance and repairs, and the only access to the western wall of the Starlipers' property was by way of Negleys' yard. The original owners of the Negleys' property would have reasonably foreseen the continued need for access, and thus we presume the parties intended an implied easement to that portion of the Negleys' property. *Bucciarelli*, 691 A.2d at 448.

Moreover, the Starlipers testified that the exterior wall now includes two windows, air vents, vinyl siding, and a rain gutter. These modern improvements would have been open and visible to the Duperts/Negleys at the time they purchased the property, and would have indicated the Starlipers' ongoing need to access their exterior. The Negleys' argument that the easement is unnecessary because there are alternative measures available to the court is misplaced, as an easement by implication need not be absolutely necessary, but only contemplated as an ongoing use by the parties at the time of severance of title. *See Daddona*, 749 A.2d at 482. We thus conclude the trial court did not err or abuse its discretion in declaring the Starlipers have an easement by implication.

**II. The trial court properly awarded $1,480 in damages.**

The Negleys argue that the soil their contractors spilled onto the Starlipers' property caused no damage, as it barely penetrated the property line and grass has since regrown over it. Negleys' Br. at 14. The Negleys contend that there was no testimony corroborating the Starlipers' estimated cost to remove the debris, grade the yard, and replant the grass. *Id.* at 15. The Negleys also argue that the Starlipers acknowledged some of the debris was there prior to the construction, and the $1,480 cost estimate provided by the Starlipers did not specify whether it included the debris for which the Negleys are not responsible. *Id.*

When trespass causes injury to real property, the measure of damages is as follows: "Assuming the land is reparable, the measure of damage is the lesser of: (1) the cost to repair, or (2) the market value of the damaged property (before it suffered the damage, of course)." *Slappo v. J's Dev. Assocs., Inc.*, 791 A.2d 409, 415 (Pa.Super. 2002).

We review a challenge to the calculation of damages for abuse of discretion. *J.J. Deluca Co., Inc. v. Toll Naval Assocs.*, 56 A.3d 402, 417 (Pa.Super. 2012). The calculation of damages "is a factual question to be determined by the fact-finder," who must "assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses." *Id.* (quoting *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 937 A.2d 503, 514 (Pa.Super. 2007)). Further,

Although the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

*Id.* at 417-18 (quoting **Liss**, 937 A.2d at 514).

Here, the Negleys conceded that their contractors had left debris on the Starlipers' lawn, and the Starlipers testified that the estimated cost of repairing the lawn—including removing the debris, grading the yard, and replanting the grass—was $1,480. This testimony was corroborated by a written estimate by a landscaping service. However, as the Starlipers admitted that the Negleys were not responsible for all of the debris on their lawn, the trial court ordered the Negleys to pay the Starlipers $1,480, "minus the cost of any repair not directly related to [the Negleys]' actions." Order, 7/30/18, at 1. Thus, the court did not order the Negleys to pay for the debris that was not caused by their construction, and the Negleys' argument that the court erred in concluding that damages were due, or in calculating the damages, has no merit.

Moreover, the Negleys did not question the Starlipers during trial as to whether the estimate they provided included the debris that was already on the Starlipers' lawn, or present any rebuttal evidence regarding the cost to repair the Starlipers' yard. The only evidence available to the trial court regarding the cost of repair was the testimony of the Starlipers. We cannot say it was error for the court to order damages based on the only evidence

before it. ***See Lobozzo v. Adam Eidemiller, Inc.***, 263 A.2d 432, 436-37 (Pa. 1970) ("we cannot say that the jury was in error in accepting the only evidence presented to them on the amount of damages").

### III. The trial court properly refused to dismiss the Starlipers' claims under the doctrine of laches.

The Negleys contend that the court erred in concluding the Starlipers' claims were not barred by laches. According to the Negleys, the Starlipers failed to exercise due diligence because they did not take any legal action to claim an easement until years after construction began and after the Duperts/Negleys had taken possession, finished the addition, and began construction of the fence and fire escape. Negleys' Br. at 17. The Negleys argue that the actions taken by the Starlipers prior to the Duperts/Negleys' purchase of the property were limited to complaints to the Borough regarding local ordinances and codes, and the Duperts/Negleys had no notice that a dispute existed with respect to the property. ***Id.*** at 17, 20. After the Duperts/Negleys took ownership, the Starlipers again complained only about local codes, and thus the Negleys took care to comply with the codes and receive proper permits; it was not until after their improvements to the addition were completed and they began construction of the fence and fire escape that the Starlipers claimed they had an easement. ***Id.***

The Negleys further argue that they were prejudiced by the Starlipers' delay in asserting the existence of an easement because the Negleys liquidated their "nest egg" to pay for the home and the construction, and they

- 14 -

would not have done so if they had known there was a property dispute. *Id.* at 18, 20. The Negleys also argue they were prejudiced by the Starlipers' delay in pursuing legal action because the prior owner, who began the construction of the addition, died several years ago, and other neighbors have since moved or are unable to recall when the addition was initially built. *Id.* at 19.

The doctrine of laches is an affirmative defense that bars the prosecution of stale claims and is the practical application of the maxim that "those who sleep on their rights must awaken to the consequence that they have disappeared." *Fulton v. Fulton*, 106 A.3d 127, 131 (Pa.Super. 2014) (quoting *Kern v. Kern*, 892 A.2d 1, 9 (Pa.Super. 2005)). We have explained laches as follows:

> Laches bars relief when the complaining party is guilty of want of due diligence in failing to promptly institute the action to the prejudice of another. Thus, in order to prevail on an assertion of laches, respondents must establish: a) a delay arising from petitioner's failure to exercise due diligence; and, b) prejudice to the respondents resulting from the delay.

*Id.* (quoting *Estate of Scharlach*, 809 A.2d 376, 382-83 (Pa.Super. 2002)). Evidence of prejudice "may include establishing that a witness has died or become unavailable, that substantiating records were lost or destroyed, or that the defendant has changed his position in anticipation that the opposing party has waived his claims." *Commonwealth ex rel. Baldwin v. Richard*, 751 A.2d 647, 651 (Pa. 2000).

The issue of whether laches should bar the Starlipers' claim to an easement **underneath** the Negleys' addition is moot, as the trial court did not

order the Negleys to move or remove their addition. Nor do we need to determine whether laches bars the Starlipers' claim that the fire escape infringes on the easement, as the court did not order the Negleys to move or remove the fire escape. The trial court held that these improvements to the Negleys' property could remain.

The court did grant relief on the Starlipers' claim that the Negleys' fence infringes on the easement, by ordering the Negleys to move or remove the fence, and thus the question of whether laches bars this claim is not moot. However, we do not believe the court erred in refusing to apply laches. The Negleys admitted that once they began construction of the fence in the spring of 2016, the Starlipers immediately complained that it would interfere with their "right-of-way" and ability to access their wall, specifically mentioning their access to the dryer vent. The Starlipers' counsel also sent the Negleys a cease and desist letter referencing an easement in May 2016, and the Starlipers commenced this action shortly thereafter, in July 2016. The trial court thus aptly concluded that "[i]t is beyond belief that the Negleys assumed that the Starlipers acquiesced to the construction through their conduct," Tr. Ct. Op. at 5, at least insofar as the fence was concerned. No relief is due on the issue of laches.

## IV. The trial court did not err in finding in the Starlipers' favor on their trespass claim.

The Negleys argue that the court erred in holding them liable for trespass because construction of their garage and carport diverted surface

water onto the Starlipers' land. The Negleys claim that they own the higher land, as the photographic evidence and testimony proves their land has always sloped downward onto the Starlipers' property. Negleys' Br. at 24-25. The Negleys also argue that there was no evidence they were negligent in constructing the garage, which conformed to all local codes and zoning ordinances. *Id.* at 27. The Negleys further argue there was no evidence that they created an artificial channel that greatly increased the quantity of diverted surface water, and that "[a] bald allegation by [the Starlipers] that there is more water on their property now than there was when the garage was built is not enough to merit damages in this situation." *Id.* at 27-28.

Our jurisprudence considers water a "common enemy" of neighboring landowners, who may fight against it as they will. *LaForm v. Bethlehem Tp.*, 499 A.2d 1373, 1378 (Pa.Super. 1985) (*en banc*). Thus,

> [u]nder the so-called "common-law" or "common-enemy rule," not only is an owner of higher land under no liability for damages to an owner of lower land caused by water which naturally flows from the one level to the other, but he can, at least in the development of urban property, improve his land by regrading it or erecting buildings thereon, without legal responsibility for any consequent diversion of surface waters from his property to that of adjoining owners, it being recognized that changes or alterations in the surface may be essential to the enjoyment of his property.

*Id.* (quoting *Chamberlin v. Ciaffoni*, 96 A.2d 140, 142 (Pa. 1953)). Accordingly, a landowner of higher ground is not liable for damage caused by the discharge of surface water onto neighboring property unless the landowner either (1) "diverted the water from its natural channel by artificial

- 17 -

means;" or (2) unreasonably or unnecessarily increased the quantity or changed the quality of the discharged water. *Id.*; *accord Kowalski v. TOA PA V, L.P.*, 206 A.3d 1148, 1162 (Pa.Super. 2019). The plaintiff need only prove the landowner is liable under one of the two theories of liability. *Kowalski*, 206 A.3d at 1162.

Under the first theory of liability, whether a given use of land is considered "natural" or "artificial" depends in part on whether the land is in an urban or rural setting.[5] In an urban environment, "orderly development of land . . . has always been regarded as a natural use of land." *LaForm*, 499 A.3d at 1381. In contrast, development of rural land—such as the erection of buildings and installation of pavement over natural soil—constitutes an "artificial" use of land, for which developers must take sufficient precaution so as not to burden others with the increased flow of water. *Kowalski*, 206 A.3d at 1162; *see also Miller*, 483 A.2d at 915. Such development "carries with it a responsibility on the developer to properly accommodate the increased flow of surface waters off the land, where such increase was predictable and

---

[5] *See Miller v. C.P. Centers, Inc.*, 483 A.2d 912, 915 (Pa.Super. 1984) (discussing *Westbury Realty Corp. v. Lancaster Shopping Center*, 152 A.2d 669 (Pa. 1959), in which "the Court devised a new approach to situations in which urban development of rural lands covered significant portions of natural soil with nonporous materials and buildings, thereby preventing natural seepage and increasing the flow of surface waters"); *see also LaForm*, 499 A.2d at 1380-81 (discussing the evolution of a higher legal standard for developers in rural areas).

preventable." ***LaForm***, 499 A.2d at 1380.[6] A developer of rural lands need not be found negligent to be found liable for increased flow of surface water. ***Miller***, 483 A.2d at 914-15 (rejecting argument that without a finding of negligence, defendants were not liable for development of rural lands under first theory of liability).

In addition, liability imposed under the first theory does not require an unreasonable or unnecessary increase in the quantity of surface water. ***Kowalski***, 206 A.3d at 1163. "Rather, to establish liability under this theory, a plaintiff need only show that . . . the water was discharged onto the plaintiff's property in an increased volume or force, **however, slight**." ***Id.*** (emphasis added).

The Negleys have failed to establish that the trial court erred or abused its discretion in imposing liability. First, the trial court found that the Borough of Newburg is not an urban environment. Tr. Ct. Op. at 8-9. Specifically, the court stated, "The Borough of Newburg is not a city and lacks many of the factors that distinguish urban areas from their rural counterparts[.]" ***Id.*** at 9. The Negleys have presented no argument that the court erred in determining that the Borough of Newburg is not an urban environment. They have thus failed to support and therefore waived any argument that rules regarding development in rural areas should not apply.

---

[6] ***See LaForm***, 499 A.2d at 1380-81 (holding that because increase of surface water caused by development of a rural hillside was predictable and preventable, it constituted an "artificial" land use, and developer accordingly had an affirmative duty to provide adequate drainage).

Next, the trial court found that in constructing their garage, the Negleys "diverted the water from its natural channel by artificial means," because "the Negleys' contractor . . . elevated the ground surrounding the foundation of their carport, altering the slope of the land and causing an increased flow of water onto the Starlipers' land." *Id.* at 9-10. It then imposed liability on the Negleys under the first theory of liability stated in *LaForm*.

We agree that in a rural setting, construction of a detached garage and cement carport constitutes an "artificial means" of diverting the natural flow of water between the parties' backyards. *Kowalski*, 206 A.3d at 1162. Moreover, the court's finding that the construction increased the flow of surface water into the Starlipers' backyard is supported by the Starlipers' testimony regarding the flow of water to and from their backyard before and after the construction, and the Negleys' own testimony that their contractors elevated the ground level when constructing the garage. Finally, because the court imposed liability under the first theory, the Starlipers were not required to prove that the Negleys "greatly" or unreasonably increased the flow of water, or were negligent in their construction. *Kowalski*, 206 A.3d at 1163; *Miller*, 483 A.2d at 914-15.

As the court did not err or abuse its discretion, no relief is due.

### V. The trial court did not err in finding the Negleys' addition trespassed onto the Starlipers' property.

The Negleys contend that there is no evidence supporting the Starlipers' claim that the Negleys fastened their addition to the Starlipers' addition.

- 20 -

Negleys' Br. at 28. The Negleys point out that they described in their trial testimony how the addition is fastened to the rear of their own home, and claim that this is supported by the photographic evidence. *Id.* at 28-29. The Negleys also complain that the Starlipers failed to assert they suffered any damages as a result of this alleged trespass. *Id.* at 29.

A continuing trespass is committed by the continued presence of a trespassing structure, chattel, or any other thing. *Jones v. Wagner*, 624 A.2d 166, 170 (Pa.Super. 1993). A landowner is entitled to maintain an action in equity to compel a person to remove structures that trespass on his or her property. *Id.* at 171.

Here, the trial court found that despite the conflicting testimony, the photographic evidence supported the Starlipers' claim that the Negleys' addition is attached to their home, and thus the Negleys were responsible for a continuing trespass. Tr. Ct. Op. at 12. Crediting one party's evidence over another's proof is the trial courts prerogative, which we cannot disturb. In addition, the argument that the Starlipers presented no evidence of damage to their home is beside the point, as the court did not order any monetary damages. Rather, the court only ordered the Negleys to detach their addition from their neighbor's property, an appropriate remedy for continuing trespass. *See Jones*, 624 A.2d at 171.

### VI. The trial court did not err in ordering the removal of the fence.

In their final issue, the Negleys contend that the court erred in ordering them to move or remove their fence. The Negleys argue that the fence, which

they can quickly take down and put back up, does not obstruct the easement, and cite cases wherein this Court held that the erection of a swinging gate did not obstruct an easement. Negleys' Br. at 30-31.[7] The Negleys also argue they testified they are willing to periodically take down the portion of the fence that sits upon the easement, to accommodate the Starlipers' needs to maintain their wall. *Id.* at 31-32.

"An easement, once acquired, may not be restricted unreasonably by the possessor of the land subject to the easement." *Palmer v. Soloe*, 601 A.2d 1250, 1252 (Pa.Super. 1992). "[T]he property owner may not take actions that 'completely deny' use of the easement [and] may not interfere unreasonably with the easement holder's use of the easement." *Id.* Whether the landowners acts constitute "unreasonable interference" depends upon the advantage of the acts to the landowner and the disadvantage to the easement-owner. *Id.* at 1252-53. The erection of a moveable gate may constitute unreasonable interference under a certain set of circumstances, such as where it "completely denies" the rights of the easement user. *Matakitis v. Woodmansee*, 667 A.2d 228, 232-33 (Pa.Super. 1995).

In analyzing this issue, the trial court noted that "[t]he Negleys concede that they would have to remove the fence for the Starlipers to utilize the easement." Tr. Ct. Op. at 15. The court stated that although the Negleys asserted they would remove the fence on occasion as requested, the court

---

[7] The Negleys cite *Haig Corp. v. Thomas S. Gassner Co.*, 63 A.2d 433 (Pa.Super. 1949) and *Helwig v. Miller*, 47 Pa. Super. 171 (Pa.Super. 1911).

was not confident that "such a system would work efficiently or effectively." *Id.* The court thus concluded the fence infringes on the Starlipers' use of the easement, and ordered the Negleys to remove the fence from the easement. *Id.*

The trial court properly concluded that the fence unreasonably interferes with the Starlipers' use of the easement, as the evidence demonstrates that it forecloses the Starlipers' ability to maintain the exterior of their wall. Moreover, the obstruction posed by the fence would not be remedied by a gate through the fence, as the Starlipers require use of the land upon which the fence itself sits. The court was not obligated to accept the Negleys' offer of periodically removing the fence, a resolution that could easily lead to further disputes. Instead, by ordering the Negleys to move their fence such that it begins at the edge of the Starlipers' addition, the court ensured the Starlipers' ability to utilize the easement, while allowing the Negleys to keep a fence along the open portions of their property line. The court was well within its discretion to fashion such a compromise.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/04/2019

- 23 -